UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

| | |
|---|---|
| ALYSSON MILLS, IN HER CAPACITY AS RECEIVER FOR ARTHUR LAMAR ADAMS AND MADISON TIMBER PROPERTIES, LLC, | Case No. 3:19-cv-00196 |
| | Arising out of Case No. 3:18-cv-252, *Securities and Exchange Commission v. Arthur Lamar Adams and Madison Timber Properties, LLC* |
| Plaintiff, | |
| v. | Hon. Carlton W. Reeves, District Judge |
| BANKPLUS; BANKPLUS WEALTH MANAGEMENT, LLC; GEE GEE PATRIDGE, VICE PRESIDENT AND CHIEF OPERATING OFFICER OF BANKPLUS; STEWART PATRIDGE; JASON COWGILL; MARTIN MURPHREE; MUTUAL OF OMAHA INSURANCE COMPANY; and MUTUAL OF OMAHA INVESTOR SERVICES, INC., | |
| Defendants. | |

## RECEIVER'S OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

Alysson Mills, in her capacity as the court-appointed receiver for Arthur Lamar Adams and Madison Timber Properties, LLC (the "Receiver"), through undersigned counsel, opposes the motion to dismiss filed by Defendants BankPlus and BankPlus Wealth Management, LLC (collectively, "BankPlus"); Gee Gee Patridge; Jason Cowgill; and Mutual of Omaha Insurance Company and Mutual of Omaha Investor Services, Inc. (collectively, "Mutual of Omaha").[1]

---

[1] Doc. 30 (BankPlus); Doc. 33 (Gee Gee Patridge); Doc. 40 (Jason Cowgill); Docs. 46, 48 (Mutual of Omaha). Because the motions present the same arguments and the underlying facts and applicable law overlap, the Receiver responds to all five motions in this one brief. The Receiver sometimes refers to Gee

## INTRODUCTION

Defendants are a bank, a financial services company, and their employees who for more than seven years lent their influence, their professional services, and even their customers to the Madison Timber Ponzi scheme, establishing for it a de facto DeSoto County headquarters within BankPlus's Southaven, Mississippi branch office. Defendants move to dismiss the Receiver's claims against them on the primary premise that Defendants did not know that Madison Timber was a Ponzi scheme.

Defendants do not dispute the facts alleged in the complaint so much as the reasonable inferences drawn from them. Defendant BankPlus contends there are "more likely explanations" for why its employees did what they did. According to BankPlus, Gee Gee Patridge, BankPlus's long-time Chief Financial Officer and, later, Chief Operations Officer, was moved by "love and trust" for Wayne Kelly, a family friend, to help grow Madison Timber's business.[2] Defendant Jason Cowgill, the manager of BankPlus's Southaven branch office, says he took comfort in Gee Gee Patridge's involvement in Madison Timber when he facilitated Madison Timber investments.[3] Everyone claims they relied on the expertise and diligence of "well-known law firms Butler Snow and Baker Donelson," whose affiliations they say legitimized Madison Timber.[4] It is simply not "conceivable," Defendants contend, that *they* did anything wrong.[5]

---

Gee Patridge, Stewart Patridge, Jason Cowgill, and Martin Murphree collectively as the "Individual Defendants." She sometimes refers to all defendants collectively as "Defendants." Because the briefs filed by Mutual of Omaha Insurance Company and Mutual of Omaha Investor Services, Inc. are identical except for Mutual of Omaha Insurance Company's alter ego argument, the Receiver's citation to Record Document 49 is meant to respond to the arguments of both Mutual of Omaha defendants.

[2] *See, e.g.*, Doc. 31 at 2.

[3] *See, e.g.*, Doc. 39 at ¶ 34.

[4] *See, e.g.*, Doc. 31 at 2; Doc. 35 at ¶ 36; Doc. 39 at ¶ 36.

[5] *See, e.g.*, Doc. 31 at 4 ("the Complaint does not cross the threshold from the conceivable to the plausible").

One thing is clear: While all Defendants knew enough facts that one might reasonably conclude that they knew or should have known that Madison Timber was a fraud, Defendant BankPlus *did know*. The complaint expressly alleges that BankPlus "knew as early as 2009, and no later than 2015, that Madison Timber was a fraud."[6] By 2015, BankPlus management had called Madison Timber "kind of spooky"[7] and "a pyramid scheme"[8] and had noted that Madison Timber "doesn't look/sound good"[9] and "appears to be money laundering."[10] Investors, including BankPlus customers, did not know what BankPlus knew. BankPlus's silence allowed Madison Timber to continue to grow.[11]

Defendants no doubt have many explanations for their acts, and they will have an opportunity to offer "the full context" that they say will undermine the complaint.[12] For now, however, it is enough that the complaint alleges sufficient facts to state claims against each of the Defendants—for civil conspiracy, aiding and abetting, and recklessness, gross negligence, and at a minimum negligence against all Defendants; for negligent retention and supervision against Defendants BankPlus and Mutual of Omaha; for violation of Mississippi's Racketeer Influenced and Corrupt Organization Act against Defendant BankPlus; and for violation of Mississippi's Uniform Fraudulent Transfer Act against Defendant Jason Cowgill. The complaint separately alleges Defendants BankPlus and Mutual of Omaha are vicariously liable for the acts of their employees and of their alter ego affiliates. Each Defendant has moved to dismiss each of the claims against them, and the Receiver addresses their arguments here.

---

[6] Doc. 1 at ¶¶ 59–74.

[7] Doc. 1 at ¶ 61.

[8] Doc. 1 at ¶ 63.

[9] Doc. 1 at ¶ 62.

[10] Doc. 1 at ¶ 65.

[11] Doc. 1 at ¶ 74.

[12] *See, e.g.*, Doc. 31 at 3-4 (arguing "the full context" undermines the complaint).

Contrary to Defendants' arguments, the Receiver need not prove each Defendant's actual knowledge that Madison Timber was a Ponzi scheme to survive their motions to dismiss. It is enough that the complaint expressly alleges each Defendant knew or should have known, and there are ample facts that if true establish that each Defendant did know.

Also contrary to Defendants' arguments, the Receiver does not lack standing to pursue her claims. The Receiver filed this lawsuit in her capacity as Receiver and pursuant to the powers vested in her by the Court's orders and applicable law. The Receiver has standing to pursue, *inter alia*, claims against third parties whose actions contributed to the success of the Madison Timber Ponzi scheme, and therefore to the debts of the Receivership Estate. As the Fifth Circuit has held in comparable cases, the *in pari delicto* doctrine does not apply.

## ARGUMENT

A complaint should state "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "When considering a motion to dismiss under Rule 12(b)(6), the Court accepts the plaintiff's factual allegations as true and makes reasonable inferences in the plaintiff's favor." *Handy v. U.S. Foods, Inc*., No. 3:14-cv-854, 2015 WL 1637336, at *1 (S.D. Miss. Apr. 13, 2015) (citing *Iqbal*, 556 U.S. at 678).

BankPlus contends that the complaint must satisfy Rule 9(b)'s heightened pleading standard because its claims "involve fraud."[13] In fact, the complaint does not allege BankPlus is liable for fraud; neither fraud nor scienter are elements of the Receiver's claims. "Where averments of fraud are made in a claim in which fraud is not an element, an inadequate averment of

---

[13] Doc. 31 at 15.

fraud does not mean that no claim has been stated." *Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*, 238 F.3d 363, 368 (5th Cir. 2001).

Nevertheless, the complaint easily meets Rule 9(b)'s standard. The complaint specifically alleges that from January 2011 until Madison Timber's collapse on April 19, 2018, BankPlus employees substantially assisted Madison Timber's growth by recruiting new investors to Madison Timber, including from BankPlus's own customers;[14] lending their influence to Madison Timber, including by serving as a reference to potential investors;[15] lending their resources, including BankPlus office space, for Madison Timber meetings;[16] facilitating the financial transactions on which Madison Timber relied—payments to and from its investors and to and from its recruiters;[17] and facilitating transfers, or "loans," from Wayne Kelly to Madison Timber that masked Madison Timber's insolvency.[18] The allegations in the complaint undoubtedly provide BankPlus with "adequate notice of the nature and grounds" of the Receiver's claims.

If the complaint lacks the requisite particularity (and it does not), the remedy is not dismissal, but amendment. Fed. R. Civ. P. 15(a) ("The court should freely give leave [to amend] when justice so requires."); *Lone Star Ladies Inv. Club*, 238 F.3d at 367 (5th Cir. 2001) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)) ("Not surprisingly, denying leave to amend, absent articulable reason, is 'not an exercise of discretion' but rather 'abuse of . . . discretion.'").

---

[14] *See, e.g.*, Doc. 1 at ¶¶ 19, 27–32, 33–37, 38, 54, 56, 72.

[15] *See, e.g.*, Doc. 1 at ¶¶ 38–42.

[16] *See, e.g.*, Doc. 1 at ¶¶ 33–37.

[17] *See, e.g.*, Doc. 1 at ¶¶ 43–55, 67.

[18] *See, e.g.*, Doc. 1 at ¶¶ 51–52, 64–71.

I.   **BankPlus and Mutual of Omaha are responsible for their employees' acts.**

The complaint alleges BankPlus and Mutual of Omaha employed the Individual Defendants and are vicariously liable for their acts.

BankPlus argues it cannot be liable for its employees' acts because its employees did not act within the scope of their employment. But while BankPlus contends that its employees' actions were "clearly beyond" the scope of their employment in one breath,[19] in the next it contends that those same actions were "routine banking and trading activities."[20] BankPlus cannot have it both ways.

The case on which BankPlus relies to argue that the Individual Defendants did not act within the scope of their employment is inapplicable here. *Seay* involved an employee who conducted romantic affairs at their workplace. *Baker Donelson Bearman Caldwell & Berkowitz, P.C. v. Seay*, 42 So. 3d 474, 487 (Miss. 2010) (concluding that an attorney's affair with a client's wife was not related to representation of the client). A romantic affair is "the quintessential example of an activity that is for purely personal benefit and outside the scope of employment." *Seay*, 42 So. 3d at 488. This lawsuit does not allege a romantic affair.

*Seay* involved a Baker Donelson shareholder. In holding that the shareholder's affair with a client's wife was not within the scope of his employment, the Mississippi Supreme Court observed that his conduct was "different in kind from that authorized" by Baker Donelson. *Id.* (emphasis removed). Here, by contrast, the Individual Defendants' acts were "of the kind [they were] employed to perform." *Id.* (quoting Restatement (Second) of Agency § 228(1)(a)). Gee Gee Patridge, BankPlus's long-time Chief Financial Officer and, later, Chief Operations Officer,

---

[19] Doc. 31 at 21.
[20] Doc. 31 at 25.

facilitated wire transfers, provided bank statements to Wayne Kelly, and managed BankPlus customers' investments.[21] Jason Cowgill was the manager of BankPlus's Southaven branch office who provided office space at BankPlus's Southaven branch and verified certain wires, commissions, and deposits of Madison Timber investors' checks.[22] Stewart Patridge and Martin Murphree were registered investment advisors and registered brokers affiliated with BankPlus Wealth Management, LLC who worked in BankPlus's DeSoto County branch offices. Patridge and Murphree identified BankPlus customers who might be recruited to invest in Madison Timber and recruited them in return for commissions paid by Wayne Kelly.[23] Even after they left BankPlus, Patridge and Murphree continued to use BankPlus's Southaven branch office to facilitate Madison Timber's business.[24]

Given that BankPlus itself calls these acts "routine,"[25] it cannot credibly dispute that the Individual Defendants acted within the scope of their employment, such that it is vicariously liable. *See, e.g., Rotstain*, 2015 WL 13034513, at *11 (even the provision of "routine banking services" is "sufficient to allege substantial assistance and an overt act in furtherance of a

---

[21] Doc. 1 at ¶¶ 38–42, 49, 68–69.

[22] Doc. 1 at ¶¶ 34, 47. Although not within the four corners of the complaint, Cowgill's answer is telling. *See* Answer and Affirmative Defenses of Jason Cowgill, Doc. 39, ¶¶ 27 ("Cowgill admits that he assisted with deposits that pertained to Madison Timber at the express authorization and direction of the appropriate shareholder."), 35 ("Cowgill admits that Kelly, a BankPlus customer, expressly authorized and directed him to withdraw funds from the Kelly Management account, a BankPlus account, and to make those funds available to Stewart Patridge."), 47 ("Cowgill admits that he verified the completion of deposits and wires at the request of Wayne Kelly or Stewart Patridge for deposits initiated by Madison Timber to investors that were also BankPlus account holders."), 49 ("Cowgill admits that he called investors to notify them that Stewart Patridge was no longer involved with Madison Timber, that Cowgill could continue to confirm deposits of their proceeds checks if they desired for him to do so, or that they could handle their deposits into their accounts themselves."), 52 ("Cowgill admits that BankPlus . . . made loans to BankPlus customers using their Madison Timber promissory notes as collateral or an income source . . ."), 65 ("Cowgill admits that he assisted with deposits relating to Madison Timber at the express authorization and direction of the respective BankPlus customers associated with the corresponding account.").

[23] Doc. 1 at ¶¶ 31–32.

[24] Doc. 1 at ¶ 34.

[25] Doc. 31 at 26; *see also* Doc. 31 at 28 ("[T]he Complaint alleges routine activity by the bank related to servicing customers' accounts.").

conspiracy" if those services "inherently facilitated the financial transactions and operations that formed the lifeblood of the [Ponzi] scheme").

Mutual of Omaha also argues it cannot be liable for the acts of Stewart Patridge and Martin Murphree, because the complaint does not allege Mutual of Omaha's "actual backing" and because, it contends, Patridge and Murphree acted outside the scope of their employment with Mutual of Omaha.[26] Mutual of Omaha is wrong on both accounts. First, the complaint need not allege that Mutual of Omaha provided "actual backing" to Patridge and Murphree. It is more than sufficient that the complaint alleges that, in light of numerous red flags, Mutual of Omaha—a sophisticated financial services company—knew or should have known that Patridge and Murphree, registered brokers affiliated with Mutual of Omaha, were selling Madison Timber investments.

Second, the complaint alleges facts sufficient to show that Patridge and Murphree acted within the scope of their employment with Mutual of Omaha. The complaint alleges that Patridge and Murphree were "registered investment advisor[s] and registered broker[s] affiliated with Mutual of Omaha Investor Services, Inc. . . . and possibly . . . ordinary agent[s] affiliated with Mutual of Omaha."[27] The complaint further alleges that "Patridge and Murphree, as agents of Mutual of Omaha, substantially assisted Madison Timber's growth by recruiting new investors to Madison Timber."[28]

Mutual of Omaha misunderstands the Receiver's burden at this early stage of litigation. In support of its argument that neither Patridge nor Murphree acted within the scope of their employment, Mutual of Omaha relies on *FSC Securities Corp. v. McCormack*, 630 So. 2d 979

---

[26] Doc. 49 at 7–10.

[27] Doc. 1 at ¶ 76–77.

[28] Doc. 1 at ¶ 79.

(Miss. 1994), and *Morgan v. MML Investors Services, Inc.*, 226 So. 3d 590 (Miss. Ct. App. 2017).[29] But *FSC Securities Corp.* was an appeal from a lower court's denial of a motion to amend final judgment **after a bench trial**.[30] *Morgan* was an appeal from a **summary judgment rendered after discovery**.

A complaint need only allege facts to create a "reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The complaint is sufficient at this stage to allege that the Individual Defendants acted within the scope of their employment, such that BankPlus and Mutual of Omaha are vicariously liable for their acts.

## II.     The complaint states a claim for civil conspiracy.

A conspiracy is "a combination of persons for the purpose of accomplishing an unlawful purpose or a lawful purpose unlawfully." *Shaw v. Burchfield*, 481 So. 2d 247, 255 (Miss. 1985). An agreement to conspire "may be express, implied, or **based on evidence of a course of conduct**." *Bradley v. Kelley Bros. Contractors*, 117 So. 3d 331, 339 (Miss. Ct. App. 2013) (emphasis added). The three elements of a civil conspiracy claim are: "(1) the existence of a conspiracy, (2) an overt act in furtherance of that conspiracy, and (3) damages arising therefrom." *Wells v. Shelter Gen. Ins. Co.*, 217 F. Supp. 2d 744, 753 (S.D. Miss. 2002) (citing *Delta Chem. & Petroleum, Inc. v. Citizens Bank of Byhalia*, 790 So. 2d 862, 877 (Miss. App. 2001)). In determining whether a civil conspiracy exists, damages—as opposed to the agreement—"are the

---

[29] Doc. 49 at 8–9.

[30] The court in *FSC Securities Corp.* found it important that the broker's employer investigated and suspended the broker when the employer learned of possible wrongdoing. 630 So. 2d at 985. Note that here the complaint expressly alleges that "Mutual of Omaha, which is a sophisticated financial services company, was in an advantageous position to discover that Madison Timber that Madison Timber was a fraud," Doc. 1 at ¶ 79, and that, despite Mutual of Omaha's "duty to supervise its agents to ensure that they were not selling investments in a Ponzi scheme," ¶ 79, "Mutual of Omaha did nothing to supervise its agents in their sales of Madison Timber investments—or if it did, it did nothing to investigate Madison Timber," ¶ 80.

essence." *Rex Distrib. Co., Inc. v. Anheuser-Busch, LLC*, No. 2018-IA-00037-SCT, 2019 WL 2223661, at *8 (Miss. May 23, 2019) (quoting *Bradley*, 117 So. 3d at 339) ("The elements [of a claim for civil conspiracy] are quite similar to those required of a criminal conspiracy, with the distinguishing factor being that an agreement is the essence of a criminal conspiracy, while damages are the essence of a civil conspiracy.") (internal quotation marks omitted).

BankPlus argues the complaint does not state a civil conspiracy claim because its allegations do not "imply [BankPlus's] agreement" to assist Madison Timber, because the complaint does not allege that "BankPlus knew Mr. Adams operated a fraudulent scheme and agreed to conspire with him to further the scheme unlawfully."[31] Mutual of Omaha, Gee Gee Patridge, and Jason Cowgill make the same argument. The argument fails for multiple reasons.

### A. The Receiver may show, but is not required to show, that Defendants committed an overt act in furtherance of the conspiracy.

Although she may do so, the Receiver is not required to show that BankPlus, Mutual of Omaha, or any of the Individual Defendants committed an overt act in furtherance of the conspiracy, only that they "agreed to and participated in [Lamar Adams's and Wayne Kelly's] course of action." *Rex Distrib.*, 2019 WL 2223661 at *8. The Mississippi Supreme Court made clear in a recent opinion that it is "a fundamental misstatement of the nature of civil conspiracy" to contend—as Defendants do—that liability for civil conspiracy depends on every alleged coconspirator having committed an overt act that damaged the plaintiff. *Id*. Civil conspiracy "exists as a cause of action to hold nonacting parties responsible." *Id.* (emphasis added). To state a claim for civil conspiracy, the Receiver "has to show an unlawful overt act and [she] has to show damages, but the overt act need not be by [BankPlus, Mutual of Omaha, or any one of the

---

[31] Doc. 31 at 18–19.

Individual Defendants]." *Id.* It is enough that the Receiver shows an overt act by Lamar Adams and Wayne Kelly and that Defendants participated in Adams's and Kelly's "course of action."

It is undisputed that Lamar Adams and Wayne Kelly, principals of Madison Timber, committed overt acts in furtherance of the Madison Timber Ponzi scheme. The complaint alleges Defendants agreed to and participated in Adams's and Kelly's "course of action" by, among other things, recruiting investors to Madison Timber and facilitating their investments.[32] Kelly in turn paid the Individual Defendants commissions for each investor they recruited.[33]

Simply put, Defendants "agreed to and participated in [Lamar Adams's and Wayne Kelly's] course of action." *Rex Distrib.*, 2019 WL 2223661 at *8. The complaint's allegations are more than sufficient to state a claim for civil conspiracy.

### B. Defendants knew or should have known that Madison Timber was a fraud.

BankPlus, Gee Gee Patridge, and Jason Cowgill argue they cannot be liable for civil conspiracy because the Receiver cannot allege that they had actual knowledge that Madison Timber was a fraud.[34] They misunderstand what is required of the Receiver at this early stage of litigation. In any event, the complaint alleges that BankPlus knew Madison Timber was a fraud and nonetheless allowed its employees to continue facilitating investments in Madison Timber.

Mississippi law holds that a conspiracy can be formed by a "mere tacit understanding between the conspirators to work to a common purpose." *Aetna Ins. Co. v. Robertson*, 94 So. 7, 22 (1922), *modified on suggestion of error for other reason*s, 95 So. 137 (1923). Defendants formed a common purpose with Lamar Adams and Wayne Kelly to recruit investors to Madison Timber and

---

[32] *See, e.g.*, Doc. 1 at ¶¶ 19, 27–32, 33–37, 38–40, 49–56, 72, 78.

[33] *See, e.g.*, Doc. 1 at ¶¶ 29, 32, 35, 51, 54.

[34] *See* Doc. 31 at 18–22; Doc. 34 at 7–9; Doc. 41 at 2–3. Mutual of Omaha does not make this argument; it argues only that the Receiver did not allege an overt act by Mutual of Omaha committed in furtherance of the conspiracy. As discussed above, the Receiver need not make such a showing.

facilitate their investments.[35] BankPlus knew that the Individual Defendants used their affiliation with BankPlus to recruit new investors to Madison Timber and allowed it.[36] BankPlus knew that Madison Timber was a fraud, but said nothing to the dozens of unknowing investors, including BankPlus customers, who it exposed to Madison Timber.[37] *See, e.g.*, *Rotstain*, 2015 WL 13034513, at *11 (even the provision of "routine banking services" is "sufficient to allege substantial assistance and an overt act in furtherance of a conspiracy" if those services "inherently facilitated the financial transactions and operations that formed the lifeblood of the [Ponzi] scheme").

BankPlus, Gee Gee Patridge, and Cowgill all cite *Midwest Feeders, Inc. v. Bank of Franklin*, 886 F.3d 507, 520 (5th Cir. 2018), for the general proposition that civil conspiracy requires proof that the coconspirator "knew of [the] fraudulent scheme." In fact, in affirming summary judgment in that case, the Fifth Circuit nevertheless observed that "civil conspiracy can be—and often is—established through circumstantial evidence." *Id.* at 520. Indeed, the district court in *Midwest Feeders* denied a motion to dismiss because alleged "circumstantial evidence" created "a factual inquiry regarding a civil conspiracy." *Midwest Feeders, Inc. v. Bank of Franklin*, 114 F. Supp. 3d 419, 431 (S.D. Miss. 2015). Where one conspirator had "confessed to fraudulent activity," it was sufficient, at the motion to dismiss stage, that his coconspirators were alleged to have failed to investigate. *Id.*

Here the complaint alleges more than circumstantial evidence. Far from "piling inference upon inference" or engaging in "speculation and conjecture,"[38] the complaint expressly alleges

---

[35] Doc. 1 at ¶¶ 19, 27–32, 33–37, 38–40, 49–56, 72.

[36] Doc. 1 at ¶ 88.

[37] Doc. 1 at ¶ 74.

[38] Doc. 34 at 8.

that all Defendants "knew or should have known that Madison Timber was a Ponzi scheme"[39] and specifically details numerous red flags, any one of which should have alerted them that Madison Timber was a fraud.[40] These red flags, summarized in paragraph 58 of the complaint, included the following:

a.  The timber deeds and cutting agreements between landowners and Madison Timber were fake. The landowners' signatures, forged by Adams, often looked the same. A call to any one of the hundreds of purported landowners, or a simple check of the title for any one of the hundreds of purported tracts of land, would have confirmed the truth.

b.  Madison Timber had no real contracts with any mills. A call to any one of the mills for which Madison Timber purported to have contracts would have confirmed the truth.

c.  Madison Timber required that an investor agree that he or she would not record the deed by which Madison Timber purported to grant its own rights to the investor unless and until Madison Timber failed to make a payment due under the promissory note. These agreements were irregular and suspicious.

d.  The "profit" that Adams promised was 300% to 400% better than that payable by any other fully collateralized investment and was uniform and consistent. These profits were irregular and suspicious.

e.  Madison Timber purported to have identified mills with an insatiable demand for timber at uniform prices. The market price for timber is readily available from multiple sources, and any one of those sources would have confirmed that the market price for timber actually rises and falls, sometimes dramatically, over short periods of time.

f.  In 2014, Adams decided that he did not want to have to manage Madison Timber during the month of December. Madison Timber's recruiters were advised that Madison Timber would not issue checks in December going forward; what had been a 12-month payoff would become a 13-month payoff, skipping the last month of the year. This event was suspicious.

g.  In October 2016, Madison Timber abruptly changed banks, and each recruiter was responsible for collecting within a short period of time all outstanding pre-dated checks from his individual investors and then reissuing new pre-dated checks drawn from Madison Timber's new account at a different bank. This event was suspicious.

The complaint thus does not rely on "bare assertions."

The complaint also does not "hedge." It does not rely on red flags alone—it alleges that, as early as 2009, and by no later than 2015, BankPlus suspected, and eventually confirmed, that

---

[39] Doc. 1 at ¶ 89.

[40] Interestingly, Gee Gee Patridge argues "[t]he 'red flags' cited by the Receiver would have been available to all investors," Doc. 34 at 8, but then concedes that she—an investor until 2014—"did not independently confirm the underlying Madison Timber investments were real." Doc. 34 at 4.

Madison Timber was a fraud. The complaint expressly alleges at paragraphs 59–71 that

BankPlus's management was aware of multiple reports and inquiries:

> 60.   In March 2009, a BankPlus vice president emailed colleagues, including members of BankPlus's fraud department and BankPlus's president for Madison County, to advise that a BankPlus account in the name of "Madison Timber Company LLC" had triggered a "Kite Suspect report." She described the situation:
>
> > [T]he customer had come in a few days ago . . . concerned about some checks he had "written to clients", and that a wire had not come in to cover them. . . . [A]fter some conversation Mr. Adams indicated that he was friends with [a BankPlus colleague] and he would also call him. I contacted [the BankPlus colleague] and he stated that he does know Mr. Adams and that Mr. Adams had called him about the checks. . . .
> >
> > After reviewing the transactions occurring on the account I became very concerned about what has been transpiring over the last month. Last night there was a deposit for $44,450 consisting of a check drawn on [an account at another bank], and 2 checks paid for $29,000 and $16,000 payable to "MTC" that appear to have been deposited at [the other bank]. The current balance in the account is $1,473.53 . . . I will say here that the signatures on the . . . checks being deposited are very similar to the signatures on the Madison Timber Company checks that are paying.
> >
> > Although we have received 2 wires in to the account . . . , the "check" deposits to "check" paying transactions have continued after both wires, and the daily balances have continued to diminish.
> >
> > Please review the activity in this account . . . .
>
> On information and belief, BankPlus "had a conversation" with Adams but did not require him to close Madison Timber's account, which was still open at the time of Madison Timber's collapse on April 19, 2018. Going forward, however, Adams directed all investors to wire money to Madison Timber's account at Trustmark instead.
>
> 61.   In January 2015, BankPlus's president for Belzoni received a complaint from a BankPlus customer and Madison Timber investor regarding Stewart Patridge's handling of his investments. He wrote one of the bank's directors to inquire if he had "any insight on what [Stewart's] doing or maybe a company Madison Timber Company (Wayne Kelly)." He offered that the "business with Stewart P . . . really sounds kind of spooky."
>
> 62.   In February 2015, BankPlus's president for Belzoni shared with the same bank director documents he had received from the investor. He noted that the investor "has called Wayne Kelly and thinks that there is nothing left there and can't find Stewart." "Not much information to go on," he added, "but doesn't look/sound good to me."
>
> 63.   Apparently unrelatedly, in March 2015, BankPlus's president for Madison County sent an email to more than a dozen BankPlus colleagues inquiring "Does anyone know anything about: Madison Timber[,] Terry Wayne Kelly[,] Kelly Management ???" Separately, on the same day, she wrote:
>
> > [A colleague] in our Canton Branch who is the officer on Madison Timber called me to say that she does not trust Lamar Adams AT ALL! She said that he is constantly sell "timber shares" to people and giving them posted dated checks. She thinks it's all like a pyramid scheme. . . . [Another colleague], manager at our Pear Orchard Branch, said Wayne Kelly calls him all the time, always in a big hurry, checking on balances, deposits, checks, etc.

14

She followed up a couple of hours later:

> [Another colleague] also knows of Lamar Adams because he is from the Greenwood area too. [He] said that over the years in talking to Greenwood people that the Madison Timber deal is a scheme. [He] also recalls [another colleague] (in our Fraud area) contacting him a while back because it appeared that they were kiting, so they had a conversation with Wayne about it and he quit . . . ALSO, [he] said that at one time Wayne Kelly was good friends with Stewart Patridge, Gee Gee's son………….just sayin'.

64.   The emails prompted BankPlus's president for DeSoto County to ask BankPlus's Bank Secrecy Act Officer, a certified anti-money laundering specialist, to look into "Wayne Kelly, Kelly Management, Madison Timber, Jason Cowgill, Magic Man LLC, Martin Murphree, & Lamar Adams."

65.   The request of BankPlus's Bank Secrecy Act Officer was made on a Friday and by the following Wednesday he had concluded Madison Timber's activities "appear to be money laundering." A few days later he shared a summary of his findings with a colleague:

> It is believed that [Jason Cowgill] facilitated the majority of check deposits and wires out [to Madison Timber] for each BankPlus customer we have identified from North Mississippi. All deposits are from the same businesses with wires being sent back to the same businesses within a few days of the deposits or, in some cases, the exact same day as the deposits. . . . The checks have BankPlus "for deposit only" stamp as the endorsements and some are handwritten and appear to be the same handwriting on all checks being deposited. Mr. Cowgill would make the deposits for all of the accounts at the same time, by giving a stack of deposit tickets and checks to the teller to process the deposits for each account. The checks deposited all note a different payment number for each investment with Madison Timber. The memo lines have numbers for 1-12. We believe this is to keep track of what number payment they are on for each investment. It appears each investment is paid back to the customer in a year.

> All of the checks are being written by Madison Timber Company, Inc. and Madison Timber Properties, LLC from Trustmark National Bank with the majority of the checks coming from Madison Timber Properties, LLC. . . . The signer for all of the checks being written off Trustmark's Madison Timber accounts is Terry Wayne Kelly. Mr. Terry Wayne Kelly does have another business account with BankPlus styled Kelly Management, LLC. Kelly Management, LLC is no longer registered with the Secretary of State for the State of Mississippi. We have contacted the signer about this issue, which is said [to] have been a mistake. The business is showing dissolved . . . .

> For the [identified accounts,] the total for the checks deposited from Trustmark is $7,783,225 and the total amount of wires back to Trustmark to Madison Timber is $7,491,617. This type of activity makes this appear to be some type of money laundering scam or scheme, which was facilitated by Jason Cowgill or Terry Wayne Kelly . . . .

> After further research in Kelly Management, we discovered that Mr. Cowgill's wife . . . is receiving "consulting fees" from Terry Wayne Kelly and Kelly Management, Inc. We also discovered that Martin Murphree's wife . . . is also receiving checks for "consulting fees" from Kelly Management.

66.   Notwithstanding these findings, BankPlus did nothing to curb Madison Timber's reliance on BankPlus to facilitate the financial transactions on which Madison Timber relied—payments to and from its investors, including BankPlus customers; payments to and from its recruiters; and transfers, or "loans," from Kelly that masked Madison Timber's insolvency. Kelly's continued use of his BankPlus accounts for Madison Timber business surprised at least one BankPlus vice

president who was aware of BankPlus's findings. Responding to an email regarding Kelly's banking activities in July 2015, the vice president responded: "I thought you said these accounts moved." It appears that BankPlus only asked Kelly to update Kelly Management's registration with the Mississippi Secretary of State.

67.  Emails show that throughout 2015 and 2016, and possibly after, Jason Cowgill continued to request the assistance of his former BankPlus colleagues to wire money from BankPlus customers' accounts to Madison Timber, and they obliged.

68.  Emails show that Gee Gee Patridge also continued to assist Kelly with his Madison Timber business. When, in July 2015, Kelly wanted to wire $230,000 from his personal account to Madison Timber, she personally instructed BankPlus employees to complete the transaction, adding "I am also coming to town if I need to sign the request." Transfers such as this, which Kelly sometimes called "loans," masked Madison Timber's insolvency and ensured that Madison Timber could continue to pay and recruit investors.

69.  Emails show that when, in April and May 2016, Kelly requested help collecting Kelly Management banking statements "to show checking deposits slips and copies of the checks," Gee Gee compiled and sent them to him.

70.  Emails show that, although Gee Gee herself ceased investing in Madison Timber in 2015, she continued to facilitate the investments of another investor. Kelly continued to make regular visits to BankPlus's Jackson headquarters to drop off and pick up that investor's paperwork at least through December 2016, and possibly after. The investor was still an investor when Madison Timber collapsed on April 19, 2018.

71.  Emails show that when a BankPlus vice president for Madison County reported that Kelly's large checks to and from Madison Timber were "throwing up a red flag to me," another BankPlus employee observed, "That's ok. I think they are ok since they have been banking with us since 2007. He is just transferring a lot of money between his personal account and Madison Timber."

Despite the fact that BankPlus suspected—and then eventually confirmed—that Madison Timber was a fraud, it allowed the Patridges, Cowgill, and Murphree to continue to facilitate investments in Madison Timber.[41] Investors, including BankPlus customers, did not know what BankPlus knew. BankPlus's silence allowed Madison Timber to continue to grow.[42]

---

[41] Doc. 1 at ¶¶ 72–73.

[42] Doc. 1 at ¶ 74. Martin Murphree's answer tells the same story. Murphree states that investors did not "possess[] the knowledge or documentation of fraud which the Complaint alleges that BankPlus management had in 2015 regarding Madison Timber," and that, if "BankPlus knew as early as 2009, and no later than 2015, that Madison Timber was a fraud, BankPlus management did not share that information" with investors. Answer and Affirmative Defenses of Martin Murphree, Doc. 35, ¶¶ 72–74.

### C.  The complaint alleges an underlying tort.

Gee Gee Patridge and Jason Cowgill argue the complaint fails to allege an underlying tort for civil conspiracy.[43] Not true. The complaint expressly alleges, *inter alia*, that Defendants are liable for recklessness, gross negligence, and at a minimum, negligence. The complaint further alleges a claim of negligent retention and supervision against BankPlus and Mutual of Omaha.

Defendants' reckless and negligent acts proximately caused harm to the Receivership Estate.[44] Without Defendants' encouragement and assistance, Madison Timber would not have continuously grown—it would have failed before ensnaring hundreds of new unwitting investors. Defendants contributed to Madison Timber's success and therefore to the Receivership Estate's liabilities today.[45]

_____

In summary, applying precedent, reading the complaint's allegations in a light most favorable to the Receiver, and indulging reasonable inferences in her favor, the complaint unquestionably states facts supporting a civil conspiracy claim sufficient to survive a motion to dismiss.

---

[43] Doc. 34 at 9; Doc. 41 at 4.

[44] Doc. 1 at ¶ 91.

[45] Doc. 1 at ¶ 92. As discussed above, the Receiver need not show that any one defendant committed an overt act in furtherance of the conspiracy. She need only show that Defendants "agreed to and participated in [Lamar Adams's and Wayne Kelly's] course of action" by assisting in the growth of Madison Timber. *Rex Distrib.*, 2019 WL 2223661 at *8.

## III.   The complaint states a claim for aiding and abetting.

### A.  This Court has recognized a claim for aiding and abetting.

BankPlus, Mutual of Omaha, Gee Gee Patridge, and Jason Cowgill all contend that the Receiver "cannot assert a state law tort claim for aiding and abetting in Mississippi."[46] Although no Mississippi state court has had the occasion to address the issue, every Mississippi federal court to address the issue has agreed that Mississippi law would recognize a claim for civil aiding and abetting as set forth in the Restatement (Second) of Torts section 876(b). This includes the United States Bankruptcy Court for the Southern District of Mississippi in *In re Evans*, 467 B.R. 399 (Bankr. S.D. Miss. 2011), which Defendants selectively quote in their memoranda.

As the *In re Evans* court explained, this Court in *Dale v. Ala Acquisitions, Inc*., 203 F. Supp. 2d 694 (S.D. Miss. 2002), made an *Erie* guess that Mississippi would recognize a cause of action under section 876(b) of the Restatement "(1) because a majority of other jurisdictions have done so and (2) because Mississippi recognizes the analogous tort of civil conspiracy." *In re Evans*, 467 B.R. at 409.[47] Since *Dale*, this Court has consistently recognized a cause of action for aiding and abetting under Mississippi state law.[48] The *In re Evans* court recognized the viability of

---

[46] Doc. 31 at 23. *See also* Doc. 49 at 13; Doc. 34 at 9; Doc. 41 at 4.

[47] BankPlus, Gee Gee Patridge, and Jason Cowgill quote the Fifth Circuit's opinion in *In re Depuy Orthopaedics, Inc., Pinnacle Health Implant Prods. Liab. Litig.*, 888 F.3d 753, 781 (5th Cir. 2018), for the proposition that "[w]hen sitting in diversity, a federal court exceeds the bounds of its legitimacy in fashioning novel causes of action not yet recognized by state courts." They then argue this Court should not recognize a cause of action for aiding and abetting fraud. *See* Doc. 31 at 23. *Depuy* applied Texas law, and the "novel issue" was "an aiding-and-abetting cause of action, outside of the conspiracy context, when the predicate offense sound[ed] in strict liability." 888 F.3d at 781. Unlike the Mississippi Supreme Court, the Texas Supreme Court had explicitly stated that it "has not expressly decided whether Texas recognizes a cause of action for aiding and abetting." *Id.* (quoting *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 244 (Tex. 2017)).

[48] *See Natchez Reg'l Med. Ctr. v. Quorum Health Res., LLC*, 879 F. Supp. 2d 556, 574 (S.D. Miss. 2012) (declining to grant summary judgment to defendants on an aiding and abetting fraud claim); *Dickens v. A-1 Auto Parts & Repair, Inc.*, No. 1:18-cv-162, 2019 WL 508074, at *2 (S.D. Miss. Feb. 8, 2019) ("Federal courts in this district have concluded that Mississippi courts would recognize a claim of aiding and abetting fraud or civil conspiracy under the Restatement (Second) of Torts § 876(b)."); *U-Save Auto Rental of Am., Inc. v. Moses*, No. 1:02-cv-689, 2006 WL 211955, at *1 (S.D. Miss. Jan. 27, 2006) (denying a motion to

a cause of action based on section 876(b) but declined to hold that Mississippi law would recognize a cause of action based on section 876(**c**). 457 B.R. at 409. The Receiver's cause of action arises under section 876(b), not section 876(c).[49]

### B.  The complaint alleges sufficient facts to state a claim for aiding and abetting.

"For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself." RESTATEMENT (SECOND) OF TORTS § 876(b).

Defendants knew that Lamar Adams was the manager of his company, Madison Timber. They knew that Wayne Kelly was one of Madison Timber's principals.[50] They therefore knew that Adams and Kelly owed Madison Timber fiduciary duties of care. Mississippi law requires a manager to discharge his duties in good faith, with fair dealing, with ordinary care, and in a manner that he reasonably believes is in the best interests of the company. *See* MISS. CODE ANN. § 79-29-123(6)(a). Adams and Kelly breached those duties by misusing Madison Timber's corporate form to sustain a Ponzi scheme. *E.g., Official Stanford Inv'rs Comm. v. Greenberg Traurig, LLP*, No. 3:12-cv-4641, 2014 WL 12572881, at *8 (N.D. Tex. Dec. 17, 2014) ("the underlying fiduciary duties on which Plaintiffs' claims are based are those owed by directors and officers of the Stanford Financial Group to their respective Stanford entities").

---

dismiss a claim for aiding and abetting breach of contract); *see also Wright v. Life Investors Ins. Co. of Am.*, No. 2:08-cv-3, 2008 WL 4450260, at *1 (N.D. Miss. Sept. 26, 2008) (denying a motion to dismiss a claim for aiding and abetting fraud).

[49] Doc. 1 at ¶ 96.

[50] Doc. 1 at ¶ 29 ("Kelly had check-signing authority for Madison Timber and was sometimes held out as its vice president.").

The complaint alleges that Defendants, by recruiting investors to Madison Timber and facilitating their investments, aided and abetted Adams and Kelly in "committing breaches of duties owed by them to Madison Timber and in other tortious conduct."[51] *E.g., Official Stanford Inv'rs Comm. v. Breazeale Sachse & Wilson LLP*, No. 3:11-cv-0329, 2015 WL 13740747, at *9, n.11 and accompanying text (N.D. Tex. Mar. 24, 2015) (allegations that law firm referred clients to Ponzi scheme support "reasonable inference" of substantial assistance). Among other breaches of duty, the complaint specifically alleges that Defendants were reckless, grossly negligent, and at a minimum negligent because they were in advantageous positions to discover that Madison Timber was a fraud, but despite numerous red flags, failed to act as reasonable bank and financial services professionals.[52]

BankPlus argues that it cannot be liable for aiding and abetting because BankPlus had no "knowledge [that it was] helping the primary violator breach a duty."[53] But the complaint expressly alleges that BankPlus "knew as early as 2009, and no later than 2015, that Madison Timber was a fraud."[54] By 2015, BankPlus management had called Madison Timber "kind of spooky"[55] and "a pyramid scheme"[56] and had noted that Madison Timber "doesn't look/sound good"[57] and "appears to be money laundering."[58]

Indeed, there were warning signs all along. The complaint alleges all Defendants "knew or should have known that Madison Timber was a Ponzi scheme" in view of the numerous red flags

---

[51] Doc. 1 at ¶ 97.

[52] Doc. 1 at ¶¶ 79–81; 104–113. The complaint further alleges the underlying torts of negligent supervision and retention. Doc. 1 at ¶¶ 128–137.

[53] Doc. 31 at 24.

[54] Doc. 1 at ¶¶ 59–74.

[55] Doc. 1 at ¶ 61.

[56] Doc. 1 at ¶ 63.

[57] Doc. 1 at ¶ 62.

[58] Doc. 1 at ¶ 65.

described in the complaint.[59] BankPlus relies on the purported "universal rule in this country"—in fact created out of whole cloth by Baker Donelson, a defendant in a related case—that "banks, lawyers, brokerage houses, [or] accountants" are not liable for aiding and abetting a fraudulent scheme based on "red flags, smoke, and other irregularities."[60] BankPlus, like Baker Donelson, cites *El Camino Res., LTD v. Huntington Nat'l Bank*, 722 F. Supp. 2d 875, 907–08 (W.D. Mich. 2010). The only "universal rule" to which the *El Camino* court referred is the purported principle that "a bank's relationship is with its customer and that the bank owes third parties no duty of care to monitor a customer's activities." 722 F. Supp. 2d at 907. That principle is inapplicable here, and in any event, *El Camino* is not binding on this Court. Indeed, in Ponzi scheme cases decided in the Fifth Circuit, awareness that an investment offered "unrealistic rates of return" supports knowledge for aiding and abetting purposes. *Janvey v. Proskauer Rose LLP*, No. 3:13-cv-0477, 2015 WL 11121540, at *5 (N.D. Tex. June 23, 2015).

The complaint's allegations of BankPlus's knowledge in addition to the alleged red flags create a "plausible inference of [BankPlus's] actual knowledge" that Madison Timber was a Ponzi scheme, "which it then aided and abetted by permitting the fraud to continue through use of its accounts after it had actual knowledge of the scheme." *Perlman v. Wells Fargo Bank, N.A.*, 559 F. App'x 988, 996 (11th Cir. 2014).

Gee Gee Patridge, Jason Cowgill, and Mutual of Omaha also argue they are not alleged to have known Madison Timber was a Ponzi scheme.[61] As discussed above, the complaint expressly alleges that they "knew or should have known that Madison Timber was a Ponzi scheme" in view

---

[59] Doc. 1 at ¶ 56–58, 98.
[60] Doc. 31 at 25.
[61] Doc. 34 at 10–11; Doc. 41 at 5; Doc. 49 at 14.

of the numerous red flags described in the complaint.[62] Nevertheless, Gee Gee Patridge was

"'glad' to serve as a 'referral contact' for new potential investors,"[63] and indeed communicated

with potential investors with whom she had personal relationships and relayed information about

them to Wayne Kelly.[64] The complaint alleges that Jason Cowgill accepted "new contracts" from

BankPlus customers when they wanted to reinvest in Madison Timber and "directed BankPlus

employees to wire money from the BankPlus customers' accounts to Madison Timber."[65] Kelly

paid Cowgill commissions for this service.[66] The complaint alleges that Mutual of Omaha, a

sophisticated financial services company, was in an advantageous position to discover that

Madison Timber was a fraud, but did nothing to investigate it.[67]

Given these and other factual allegations, the complaint sufficiently alleges Defendants

gave substantial assistance and encouragement to Adams and Kelly by lending their influence,

their professional services, and even their customers to Madison Timber.[68] *See, e.g.*, *Rotstain*,

2015 WL 13034513, at \*11 (even the provision of "routine banking services" is "sufficient to

allege substantial assistance and an overt act in furtherance of a conspiracy" if those services

---

[62] Doc. 1 at ¶¶ 58, 89, 98, 131, 138, 141. The red flags are described above and in paragraph 58 of the complaint.

[63] Doc. 1 at ¶ 40. Gee Gee Patridge was willing to refer new potential investors despite the fact that she had never "independently confirm[ed] the underlying Madison Timber investments were real." Doc. 34 at 4.

[64] Doc. 1 at ¶¶ 49 ("Gee Gee provided to Kelly contact information for Stewart's investors . . . "); ¶ 41 ("Often Gee Gee already had a personal relationship with the potential investors who called her. Kelly sometimes asked her opinion of a potential investor's 'investment capacity.' In at least one instance she surmised 'I would think pretty large.'").

[65] Doc. 1 at ¶ 50.

[66] Doc. 1 at ¶ 54.

[67] Doc. 1 at ¶¶ 79–80.

[68] Because Gee Gee Patridge and Jason Cowgill were BankPlus's agents, and Stewart Patridge and Martin Murphree were Mutual of Omaha's agents, their knowledge is imputed to BankPlus and Mutual of Omaha, respectively. *See Lane v. Oustalet*, 873 So. 2d 92, 95–96 (Miss. 2004) ("The law of agency generally imputes knowledge and information received by an agent in conducting the business of a principal to the principal, even where that knowledge or information is not communicated by the agent to the principal."); *see also Proskauer*, 2015 WL 11121540, at \*5 (citing Texas agency law to impute a lawyer's knowledge of a Ponzi scheme to law firms where he was employed).

22

"inherently facilitated the financial transactions and operations that formed the lifeblood of the [Ponzi] scheme").[69]

_____

In summary, applying precedent, reading the complaint's allegations in a light most favorable to the Receiver, and indulging reasonable inferences in her favor, the complaint states a claim for aiding and abetting.

**IV.   The complaint states a claim for recklessness, gross negligence, and at a minimum negligence; and for negligent retention and supervision.**

### A. The complaint states a claim for recklessness, gross negligence, and at a minimum negligence.

"Negligence is a failure to do what the reasonable person would do under the same or similar circumstances." *Estate of St. Martin v. Hixson*, 145 So. 3d 1124, 1128 (Miss. 2014). Recklessness "is a failure or refusal to exercise any care." *Maldonado v. Kelly*, 768 So. 2d 906, 910 (Miss. 2000).[70]

"To prevail in any type of negligence action, a plaintiff must first prove the existence of a duty." *Griffith v. Entergy Mississippi, Inc.*, 203 So. 3d 579, 585 (Miss. 2016) (quoting *Enter. Leasing Co. S. Cent. v. Bardin*, 8 So. 3d 866, 868 (Miss. 2009) (citing *Laurel Yamaha, Inc. v.*

---

[69] In an attempt to argue that "routine banking and trading activities" do not constitute substantial assistance, BankPlus relies on cases brought by investors under the Commodity Exchange Act and Rule 10b-5 of the Securities and Exchange Act. *See Amacker v. Renaissance Asset Mgmt. LLC*, 657 F.3d 252 (5th Cir. 2011) (investors brought action against futures commission merchants for violation of Commodity Exchange Act); *Bane v. Sigmundr. Expl. Corp.*, 848 F.2d 579 (5th Cir. 1988) (investors brought action under Rule 10b-5 of the Securities and Exchange Act); *Woodward v. Metro Bank of Dallas*, 522 F.2d 84 (5th Cir. 1975) (investors brought action under Rule 10b-5 of the Securities and Exchange Act). The Receiver is not suing for misrepresentations made in connection with the sale of securities and thus these cases are inapposite.

[70] *See also Dame v. Estes*, 101 So. 2d 644, 645 (Miss. 1958) ("Gross negligence is that course of conduct which, under the particular circumstances, discloses a reckless indifference to consequences without the exertion of any substantial effort to avoid them.").

*Freeman*, 956 So. 2d 897, 904 (Miss. 2007)). "In the context of an ordinary negligence action the duty of care is the requirement 'to conform to a specific standard for the protection of others against the unreasonable risk of injury. . . .'" *Clausell v. Bourque*, 158 So. 3d 384, 391 (Miss. Ct. App. 2015) (quoting *Laurel Yamaha, Inc. v. Freeman*, 956 So. 2d 897, 904 (Miss. 2007)). For banks, Mississippi law provides a specific standard: they have a statutory duty of ordinary care, which is defined as "observance of reasonable commercial standards, prevailing in the area in which the person is located, with respect to the business in which the person is engaged." MISS. CODE ANN. § 75-3-103(a)(9); *see also Delta Chem. & Petroleum, Inc. v. Citizens Bank of Byhalia, Miss.*, 790 So. 2d 862 (Miss. Ct. App. 2001) (considering whether bank was negligent for failing to apply "reasonable commercial standards").

BankPlus and its employees thus had a duty to use ordinary care, that is to observe reasonable commercial standards, in the conduct of their business. They breached that duty: The complaint alleges that BankPlus and its employees "were in advantageous positions to discover that Madison Timber was a fraud"[71] and "not only failed to exercise due care, they failed or refused to exercise any care at all in their dealings with Madison Timber."[72] The complaint separately alleges that Lamar Adams and Wayne Kelly, with the assistance of BankPlus, breached duties owed to Madison Timber by misusing its corporate form to sustain a Ponzi scheme. *E.g., Greenberg Traurig, LLP*, 2014 WL 12572881, at *8 ("the underlying fiduciary duties on which Plaintiffs' claims are based are those owed by directors and officers of the Stanford Financial Group to their respective Stanford entities").

---

[71] Doc. 1 at ¶ 107. The complaint further alleges that "[i]n view of the numerous red flags described in this complaint, a reasonable person in the same or similar circumstances would have discovered that Madison Timber was a fraud." *Id.*
[72] Doc. 1 at ¶ 108.

BankPlus argues it did not owe any duty to Madison Timber, because it only owes duties to its customers. As an initial matter, Madison Timber in fact was a customer of BankPlus. But setting that fact aside, BankPlus's liability for negligence is not limited to its customers. On this point Mississippi statutory law is clear: "In all causes of action for . . . economic loss brought on account of negligence, . . . **privity shall not be a requirement** to maintain said action." MISS. CODE ANN. § 11-7-20 (emphasis added).[73] The complaint expressly alleges "economic loss brought on account of [BankPlus and the Individual Defendants'] negligence": "But for Defendants' recklessness, or at a minimum negligence, Madison Timber would not have continuously grown—it would have failed before ensnaring hundreds of new unwitting investors."[74] The complaint states a claim for negligence.

To argue it did not owe any duty, BankPlus relies on the Fifth Circuit's opinion in *Midwest Feeders, Inc. v. Bank of Franklin*, 886 F.3d 507 (5th Cir. 2018). The Fifth Circuit in that case did not take into account section 11-7-20, which is controlling. MISS. CODE ANN. § 11-7-20 ("In all causes of action for . . . economic loss brought on account of negligence, . . . **privity shall not be a requirement** to maintain said action.") (emphasis added). In any event, the Fifth Circuit observed only that Mississippi case law did not "directly address[] whether a bank may owe a duty to a non-customer in circumstances resembling [that] case." *Midwest Feeders, Inc.*, 886 F.3d at 515. Relying on other courts' interpretations of other states' laws, the Fifth Circuit concluded that the bank in *Midwest Feeders* did not owe a duty to the non-customer in that case. The Fifth Circuit nevertheless acknowledged that "a bank may owe a duty to a non-customer in certain

---

[73] To be clear, the Receiver does not sue for misrepresentations made in connection with the sale of securities under Mississippi Securities Law. Although it may be true that BankPlus and its employees were negligent in the sale of securities, the Receiver has no standing to bring that claim—the claim belongs to investors. It is important to distinguish the Receivership Estate's negligence claim from that of an ordinary investor. The Receivership Estate's claimed damages are the debts incurred by Madison Timber, which were proximately caused by recklessness, or at a minimum negligence, of BankPlus.

[74] Doc. 1 at ¶ 110.

circumstances." *Id.* at 518. Applying *Midwest Feeders* here, even if Madison Timber were not a customer of BankPlus, this case would fall within the Fifth Circuit's own exception: "[W]hile a bank generally owes no duty to a non-customer, the bank may owe such a duty to a non-customer [Madison Timber] where 'a fiduciary relationship exists between the customer [Kelly and Adams] and the non-customer [Madison Timber], the bank knows or ought to know of the fiduciary relationship, and the bank has actual knowledge of its customer's misappropriation.'" *Id.* at 519 (quoting *Chang v. JPMorgan Chase Bank, N.A.*, 845 F.3d 1087, 1094–95 (11th Cir. 2017)); *see also id.* ("Banks are discouraged from willfully ignoring warning signs that its customer may be committing an intentional tort against the non-customer (with whom the customer as a fiduciary relationship).").

These same principles apply to all Defendants, each of whom owed a duty of care to Madison Timber to "to conform to a specific standard for the protection of others against the unreasonable risk of injury. . . ." *Clausell*, 158 So. 3d at 391.[75] Like BankPlus, all other Defendants had a duty to use ordinary care in their dealings with Adams, Kelly, and Madison Timber. The complaint alleges that they breached that duty because they "were in advantageous positions to discover that Madison Timber was a fraud"[76] and "not only failed to exercise due care, they failed or refused to exercise any care at all in their dealings with Madison Timber."[77]

---

[75] Gee Gee Patridge, Jason Cowgill, and Mutual of Omaha also contend that they owed no duty to Lamar Adams or Madison Timber. Doc. 34 at 12; Doc. 41 at 5; Doc. 49 at 12. They are wrong. The complaint separately expressly alleges that Lamar Adams and Wayne Kelly, with the assistance of Gee Gee Patridge, Cowgill, and Mutual of Omaha, breached duties owed to Madison Timber by misusing its corporate form to sustain a Ponzi scheme. *E.g., Greenberg Traurig, LLP*, 2014 WL 12572881, at *8 ("the underlying fiduciary duties on which Plaintiffs' claims are based are those owed by directors and officers of the Stanford Financial Group to their respective Stanford entities").

[76] Doc. 1 at ¶¶ 79, 107. The complaint further alleges that "[i]n view of the numerous red flags described in this complaint, a reasonable person in the same or similar circumstances would have discovered that Madison Timber was a fraud." *Id.*

[77] Doc. 1 at ¶ 108.

**B.  The complaint states a claim for negligent retention and supervision against BankPlus and Mutual of Omaha.**

Separately, the complaint also states a claim for negligent retention and supervision. A claim for negligent retention and supervision is "simply a negligence claim." *Roman Catholic Diocese of Jackson v. Morrison*, 905 So. 2d 1213, 1229 (Miss. 2005). "[A]n employer will be liable for negligent hiring or retention of his employee when an employee injures a third party if the employer knew or should have known of the employee's incompetence or unfitness." *Backstrom v. Briar Hill Baptist Church, Inc.*, 184 So. 3d 323, 327 (Miss. Ct. App. 2016) (quoting *Parmenter v. J&B Enters. Inc.*, 99 So. 3d 207, 217 (Miss. Ct. App. 2007)).

Both BankPlus and Mutual of Omaha argue they cannot be liable for negligent retention and supervision because "employers do not have a duty to supervise their employees when the employees are off-duty or not working."[78] But the case on which BankPlus and Mutual of Omaha rely, *Seay*, is the same case on which BankPlus unsuccessfully relies to argue the Individual Defendants did not act within the scope of their employment. *Seay* held only that a Baker Donelson shareholder's romantic affair with a client's wife was "different in kind from that authorized" by Baker Donelson. *Seay*, 42 So. 3d at 487. As shown above, the Individual Defendants' acts were "of the kind [they were] employed to perform." *Id.* (quoting Restatement (Second) of Agency § 228(1)(a)). Among other things, the Individual Defendants facilitated wire transfers, managed BankPlus customers' investments,[79] provided office space at BankPlus's Southaven branch, and verified certain wires, commissions, and deposits of Madison Timber

---

[78] Doc. 31 at 27 (quoting *Baker Donelson Bearman Caldwell & Berkowitz, P.C. v. Seay*, 42 So. 3d 474, 489 (Miss. 2010)). *See also* Doc. 49 at 10 (arguing that an employer has no duty to uncover its employees' "concealed, clandestine, personal activities," citing *Seay*).

[79] Doc. 1 at ¶¶ 38–42, 49, 68–69.

investors' checks.[80] Defendants also identified BankPlus customers who might be recruited to invest in Madison Timber and recruited them in return for commissions paid by Wayne Kelly.[81] These facts are sufficient to establish that the Individual Defendants acted within the scope of their employments by BankPlus and Mutual of Omaha.

At a minimum, BankPlus and Mutual of Omaha had a duty to supervise acts that the Individual Defendants undertook within their offices and in reliance on their name and resources. The complaint alleges sufficient facts, described above, which would establish that they failed to do so. When a receiver adequately pleads that an employee "provided material assistance" to a Ponzi scheme, a motion to dismiss a negligent retention or supervision claim should be denied because it is "not unreasonable to infer" that employers "were aware to some degree" of the material assistance, "[a]ssuming an ordinary degree of supervision." *Proskauer Rose LLP*, 2015 WL 11121540, at *8.[82]

Mutual of Omaha argues that the complaint does not allege that (1) Patridge and Murphree were its employees, (2) Mutual of Omaha had any knowledge of Patridge and Murphree's misconduct, or (3) Mutual of Omaha's negligence caused harm to Madison Timber.[83] Mutual of Omaha is incorrect on all accounts. First, the complaint expressly alleges that Stewart Patridge and Martin Murphree were "registered investment advisor[s] and registered broker[s] affiliated with Mutual of Omaha Investor Services, Inc. . . . and possibly . . . ordinary agent[s] affiliated with

---

[80] Doc. 1 at ¶¶ 34, 47.

[81] Doc. 1 at ¶¶ 31–32.

[82] The court in *Proskauer* applied Texas law to explain that negligent supervision "requires a plaintiff to demonstrate that the employee's tortious conduct was foreseeable to the employer." Texas's standard for negligent supervision is the same as Mississippi's. *CoTemp, Inc. v. Houston W. Corp.*, 222 S.W.3d 487, 492 (Tex. App. 2007) ("The basis of responsibility under the doctrine of negligent retention is the master's negligence in retaining in his employ an incompetent servant whom the master knows, or by the exercise of reasonable care should have known, was incompetent or unfit, thereby creating an unreasonable risk of harm to others.").

[83] Doc. 49 at 10–11.

Mutual of Omaha."[84] The complaint further alleges that "Patridge and Murphree, as agents of Mutual of Omaha, substantially assisted Madison Timber's growth by recruiting new investors to Madison Timber."[85] Whether an employer-employee relationship exists between Mutual of Omaha and its affiliated brokers is a question of fact not to be decided on a motion to dismiss. *Moreland v. Kimes & Stone Const. Co.*, 900 So. 2d 377, 379 (Miss. Ct. App. 2004) (denying summary judgment because whether an "employer/employee relationship" was created "is a question of fact for the jury to determine"). Second, the complaint expressly alleges that Mutual of Omaha "knew or *should have known* of its agents' incompetence or unfitness."[86] As Mutual of Omaha acknowledges, the Receiver's allegations of Mutual of Omaha's constructive knowledge are sufficient.[87]

Finally, the complaint alleges that Mutual of Omaha's negligence was a proximate cause of Madison Timber's harm. Mutual of Omaha contends Patridge and Murphree were no longer affiliated with Mutual of Omaha when Madison Timber collapsed, but even if true, that fact does not preclude the Receiver from establishing that Mutual of Omaha was a proximate cause of the Receivership Estate's harm. The complaint specifically alleges that "Madison Timber's relationship with Mutual of Omaha began in January 2011 and continued until Madison Timber's collapse on April 19, 2018"[88] and that, during that time, Mutual of Omaha, "which is a sophisticated financial services company, was in an advantageous position to discover that Madison Timber was a fraud . . . [and] had a duty to supervise its agents to ensure that they were

---

[84] Doc. 1 at ¶¶ 76–77.

[85] Doc. 1 at ¶ 79.

[86] Doc. 1 at ¶ 131.

[87] *See* Doc. 49 at 11. In support, Mutual of Omaha quotes *Holmes v. Campbell Properties, Inc.*, 47 So. 3d 721, 720 (Miss. 2010), which states that—**on summary judgment**—"specific evidence of an employer's actual **or constructive knowledge** of the tortious tendencies" is sufficient.

[88] Doc. 1 at ¶ 75.

not selling investments in a Ponzi scheme."[89] The fact that "Mutual of Omaha did nothing to supervise its agents in their sales of Madison Timber investments—or if it did, . . . did nothing to investigate Madison Timber . . . allowed Madison Timber to continue to grow."[90] Mutual of Omaha's contribution to Madison Timber's success—at any time during Madison Timber's existence—caused the debts of the Receivership Estate today.

The complaint states claims against BankPlus and Mutual of Omaha for negligent retention and supervision.

## V.     The complaint states a claim under Mississippi's RICO Act.

Mississippi's Racketeer Influenced and Corrupt Organization Act (the "Mississippi RICO Act") makes it unlawful for any person "employed by, or associated with, any [fraud] enterprise to conduct or participate, directly or indirectly, in such enterprise through a pattern of racketeering activity . . . ." MISS. CODE ANN. § 97-43-5.

The complaint alleges that BankPlus and its employees "associated with"[91] the Madison Timber "fraud enterprise." An enterprise, as defined by the Mississippi RICO statute, is "any individual, sole proprietorship, partnership, corporation, union or other legal entity, or any association or group of individuals **associated in fact** although not a legal entity." MISS. CODE ANN. § 97-43-3(c) (emphasis added).[92] Madison Timber was a "fraud enterprise" because a fraud enterprise includes one conducted by "mail or other means of communication," and Lamar Adams

---

[89] Doc. 1 at ¶ 79.

[90] Doc. 1 at ¶¶ 80–81.

[91] *See* Miss. Code Ann. § 97-43-3 ("It is unlawful for any person employed by, or associated with, any enterprise to conduct or participate, directly or indirectly, in such enterprise through a pattern of racketeering activity or the collection of an unlawful debt.").

[92] "[T]he existence of an enterprise is an element distinct from the pattern of racketeering activity" *Boyle v. United States*, 556 U.S. 938, 947 (2009). But the evidence used to prove both elements "may in particular cases coalesce"; in other words, "proof of a pattern of racketeering activity may be sufficient . . . to infer the existence of an association-in-fact enterprise." *Id.* at 947, 951 (internal quotation marks omitted).

was convicted of wire fraud. *See* MISS. CODE ANN. § 97-43-3.1. BankPlus "associated together [with Madison Timber] for a common purpose of engaging in a course of conduct." *Boyle*, 556 U.S. at 946 (quoting *U.S. v. Turkette*, 452 U.S. 576, 583 (1981)) ("[A]n association-in-fact enterprise is 'a group of persons associated together for a common purpose of engaging in a course of conduct.'").

At the motion to dismiss stage, an association-in-fact is sufficiently alleged if a complaint "alleges the relationships among the individuals associated with the enterprise, the purpose of the enterprise . . . , and longevity" sufficient to permit the associates to pursue the enterprise's purpose. *See Hanover Am. Ins. Co. v. Gibbs*, No. 15-cv-559, 2015 WL 5971139, at *5 (E.D. La. Oct. 14, 2015).

Wayne Kelly, who was Lamar Adams's chief "birddog," a principal of Madison Timber, and long-time friend of Stewart and Gee Gee Patridge, is at the center of the relationship between BankPlus and Madison Timber. Kelly introduced the Patridges, and later Jason Cowgill and Martin Murphree, to Adams and Madison Timber,[93] invited them to recruit investors (including BankPlus customers) to Madison Timber and to facilitate their investments,[94] and paid them commissions.[95] Gee Gee Patridge, a BankPlus senior executive, was "in constant contact with Kelly,"[96] facilitated transfers, or "loans," from Kelly to Madison Timber that masked Madison Timber's insolvency,[97] and even served as a reference for Madison Timber.[98] Adams and Kelly relied on Kelly's relationship with Gee Gee and BankPlus to grow Madison Timber.

---

[93] Doc. 1 at ¶ 30.
[94] Doc. 1 at ¶¶ 19, 27–32, 33–37, 38–40, 49–56, 72.
[95] Doc. 1 at ¶¶ 29, 32, 35, 51, 54.
[96] Doc. 1 at ¶ 39.
[97] Doc. 1 at ¶¶ 68–69.
[98] Doc. 1 at ¶¶ 38–42.

The purpose of BankPlus's association with Madison Timber is clear—BankPlus "assisted Madison Timber's growth by recruiting new investors to Madison Timber," because, "[l]ike any Ponzi scheme, Madison Timber had to continuously grow."[99] The longevity of Madison Timber depended on BankPlus's encouragement and assistance to achieve that purpose.[100]

The complaint alleges that BankPlus participated in the "fraud enterprise" that was Madison Timber. Mississippi's RICO statute, as BankPlus explains, has a lower standard than its federal analog for the "participation" element—Mississippi law prohibits participation in the enterprise's course of conduct generally, **directly or indirectly**. *Compare* MISS. CODE ANN. § 97-43-5(3) ("It is unlawful for any person . . . to . . . participate, **directly or indirectly**, in such enterprise . . .") (emphasis added) *with* 18 U.S.C. § 1962(c) ("It shall be unlawful for any person . . . to . . . participate . . . in the conduct of such enterprise's affairs . . ."). The complaint expressly alleges BankPlus's general participation in Madison Timber's course of conduct: BankPlus employees "recruit[ed] new investors to Madison Timber, including BankPlus's own customers; len[t] their influence to Madison Timber, including serving as a reference to potential investors; len[t] their resources, including BankPlus office space, for Madison Timber meetings; facilitat[ed] the financial transactions on which Madison Timber relied . . . and facilitate[ed] transfers, or 'loans,'" designed to mask Madison Timber's insolvency.[101]

BankPlus argues that the complaint does not allege a pattern of racketeering activity. For there to be a pattern, there must be "at least two (2) incidents of racketeering conduct." MISS. CODE

---

[99] Doc. 1 at ¶¶ 19, 27. *See also, e.g.*, Doc. 1 at ¶ 31 (Stewart Patridge "set about identifying BankPlus customers who he might recruit to invest in Madison Timber."); ¶ 38 ("Gee Gee Patridge . . . helped Kelly recruit bigger investors in Jackson."); ¶ 50 (Jason Cowgill "directed BankPlus employees to wire money from the BankPlus customers' accounts to Madison Timber" when they wanted to reinvest.").

[100] Doc. 1 at ¶ 91. *See also* Doc. 1 at ¶ 27 ("Madison Timber's relationship with BankPlus began in January 2011 and continued until Madison Timber's collapse on April 19, 2018.").

[101] Doc. 1 at ¶ 27.

ANN. § 97-43-3(d). The incidents must "have the same or similar intents, results, accomplices, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics and are not isolated incidents." *Id.* Racketeering activity means "to commit, to attempt to commit, **to conspire** to commit . . . any crime which is chargeable under [Mississippi's RICO Act]." MISS. CODE ANN. § 97-43-3 (emphasis added).

The complaint alleges that Lamar Adams was convicted of wire fraud and pleaded guilty to a "scheme and artifice to defraud,"[102] a crime Adams committed with the assistance of, and in conspiracy with, BankPlus. Alleging that BankPlus conspired with Adams to commit wire fraud is enough—but the complaint goes farther. It alleges that BankPlus's association with Madison Timber "began in January 2011 and continued until Madison Timber's collapse on April 19, 2018," and that BankPlus's "participation allowed the Madison Timber 'fraud enterprise' to continuously grow."[103] The complaint then details specific incidents—certainly more than the two required—in which BankPlus participated in Madison Timber's scheme. The complaint alleges that, among other things, BankPlus employees facilitated wire transfers, managed BankPlus customers' investments,[104] provided office space at BankPlus's Southaven branch, and verified certain wires, commissions, and deposits of Madison Timber investors' checks.[105]

Finally, the complaint alleges facts sufficient to show that BankPlus had knowledge of the racketeering activity. BankPlus, citing Mississippi's wire fraud statute, argues that Mississippi's RICO Act contains a knowledge component, but that the complaint "never alleges BankPlus' actual knowledge of any fraudulent conduct."[106] BankPlus ignores the allegations made in

---

[102] Doc. 1 at ¶ 22.

[103] Doc. 1 at ¶ 124.

[104] Doc. 1 at ¶¶ 38–42, 49, 68–69.

[105] Doc. 1 at ¶¶ 34, 47.

[106] Doc. 31 at 22.

paragraphs 59 through 71 of the complaint, which expressly allege BankPlus's actual knowledge: In in light of multiple internal reports and inquiries, "as early as 2009, and no later than 2015, others in BankPlus suspected, and eventually confirmed, that Madison Timber was a fraud."[107] BankPlus further ignores that, by 2015, BankPlus management had called Madison Timber "kind of spooky"[108] and "a pyramid scheme"[109] and had noted that Madison Timber "doesn't look/sound good" [110] and "appears to be money laundering." [111] BankPlus instead argues that "[t]he Complaint's 'red flags' are insufficient to plead knowledge of unlawful actions." As discussed above, the complaint does not rely on red flags alone—but even so, the alleged red flags are sufficient to show that BankPlus was "subjectively aware of a high probability" that Madison Timber was a fraud. *Chaney v. Dreyfus Service Corp.*, 595 F.3d 219, 240 (5th Cir. 2010).

BankPlus's reliance on the Fifth Circuit's opinion in *Chaney* for the proposition that "red flags" are insufficient to plead knowledge of unlawful actions does not help BankPlus. In *Chaney*, the Fifth Circuit affirmed the district court's grant of summary judgment on a receiver's RICO claim because "the record [did] not establish that any individual at [the defendant's office] was subjectively aware of a high probability that [the fraudster] was engaged in money laundering." *Id.* The "red flags" in *Chaney* were insufficient to establish knowledge for RICO purposes only because the defendant's employees were not trained to recognize the "red flags" associated with money laundering. *Id.* The court recognized that "red flags" may have been sufficient to establish knowledge if the defendant's employees were "trained to recognize the 'red flags' associated with money laundering." *Id.* Here, by contrast, BankPlus employed a "certified anti-money laundering

---

[107] Doc. 1 at ¶¶ 59–71.

[108] Doc. 1 at ¶ 61.

[109] Doc. 1 at ¶ 63.

[110] Doc. 1 at ¶ 62.

[111] Doc. 1 at ¶ 65.

specialist" with the expertise to recognize such red flags, and who in fact concluded that Madison Timber "appear[ed] to be money laundering."[112] BankPlus employed, and utilized, exactly the type of employee the court in *Chaney* observed would show a RICO defendant is "subjectively aware of a high probability that [a fraudster] was engaged in money laundering." *Chaney*, 595 F.3d at 240.

The complaint states a claim for RICO liability under Mississippi law.[113]

## VI.     The complaint states a claim under Mississippi's Uniform Fraudulent Transfer Act.

Under Mississippi's Uniform Fraudulent Transfer Act ("MUFTA"), the Receiver is entitled to avoid any transfers made with "actual intent to hinder, delay or defraud any creditor." MISS. CODE ANN. § 15-3-107(1). In the Fifth Circuit, "proving that [a transferor] operated as a Ponzi scheme establishes the fraudulent intent behind the transfers it made." *Janvey v. Alguire*, 647 F.3d 585, 598 (5th Cir. 2011) (quoting *SEC v. Res. Dev. Int'l, LLC*, 487 F.3d 295, 301 (5th Cir. 2007) (alteration in original)) (analyzing Texas's Uniform Fraudulent Transfer Act).

The complaint explains that Madison Timber was a Ponzi scheme. Investors in Madison Timber "were being repaid with new investors' money."[114] "[I]n a classic Ponzi scheme, as new investments [come] in . . . , some of the new money [is] used to pay earlier investors." *U.S. v. Setser*, 568 F.3d 482, 486 (5th Cir. 2009). On this basis alone, the complaint states a claim to avoid the payments from Madison Timber to Cowgill.

---

[112] Doc. 1 at ¶ 65; *see also* Doc. 1 at ¶¶ 59–71.

[113] BankPlus points to this Court's requirement in federal RICO cases that a plaintiff submit a "RICO Case Statement." Doc. 31 at 30. As BankPlus acknowledges, neither this Court—nor any other Mississippi court—has required a RICO case statement to be filed in connection with a claim under Mississippi's RICO Act. In any event, the complaint sufficiently alleges the RICO claim asserted against BankPlus and how those allegations satisfy Mississippi's RICO statute.

[114] Doc. 1 at ¶ 18.

**A.  The Receiver has standing to pursue her fraudulent transfer claims.**

Cowgill argues that the Receiver has no standing to assert fraudulent transfer claims because she is not a creditor. The Fifth Circuit has rejected this argument. *See Janvey v. Dillon Gage, Inc. of Dallas*, 856 F.3d 377, 385 (5th Cir. 2017) ("Janvey has standing to bring a TUFTA claim on behalf of a Stanford entity."); *Janvey v. Brown*, 767 F.3d 430 (5th Cir. 2014) ("[B]ecause the Ponzi scheme principals—Stanford and Davis—caused the Stanford entities to make fraudulent transfers that harmed the entities by dissipating their assets without receiving reasonably equivalent value in return, the Stanford principals are properly viewed as debtors under TUFTA, and the Stanford entities are the defrauded creditors under TUFTA.")[115]; *Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185, 192 (5th Cir. 2013) ("[W]e conclude that the Receiver has standing to assert the claims of [a Stanford entity], and any other Stanford entity in receivership, against the [defendants] to recover the contributions made to them without reasonably equivalent value by the Stanford Ponzi operation."); *Janvey v. Suarez*, 978 F. Supp. 2d 685, 698 ("[The Receiver and OSIC] on behalf of the receivership entities, act as creditors in this context by bringing claims for equitable disgorgement of the receivership estate's former assets that were allegedly transferred in a fraudulent setting to Suarez, who holds the role of a debtor in this context.").

*Suarez* noted that the definitions of relevant terms under TUFTA—which are identical to the definitions provided in MUFTA—"solidify the conclusion" that a receiver acts as a creditor in the context of fraudulent transfer claims. The court stated:

> Under TUFTA, a "creditor" simply means a " 'person' . . . who has a claim." TEX. BUS. & COM. CODE ANN. § 24.002(4) (West 2013). In turn, a "person" is defined as "an individual, partnership, corporation, association, organization, government or

---

[115] TUFTA, like MUFTA, provides remedies for "creditors" to recover fraudulent transfers. *Compare* MISS. CODE ANN. § 15-3-111 *with* TEX. BUS. & COM. CODE ANN. § 24.008.

> governmental subdivision or agency, business trust, estate, trust, or any other legal or commercial entity." *Id.* § 24.002(9). This broad definition of a person captures Plaintiffs' roles as a Receiver and an organization acting on behalf of those that form the receivership estate, which makes Plaintiffs creditors for TUFTA purposes. Further, Plaintiffs' allegations in the Complaint constitute TUFTA "claims" because the term is defined as "a right to payment or property, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." *Id.* § 24.002(3).

*Id.*

MUFTA's definitions of "creditor," "person," and "claim" are identical to the definitions of those terms in TUFTA, and a "creditor" under MUFTA "means a person who has a claim." Miss. Code Ann. § 15-3-101(c), (d), (i). The Receiver is a defrauded creditor under MUFTA.

### B. Transfers from a Ponzi scheme are presumptively made with fraudulent intent and without reasonably equivalent value.

Cowgill next argues the complaint does not allege "actual intent" because it only alleges two of fourteen "badges of fraud" listed in MUFTA. *See* Miss. Code Ann. § 15-3-107(2). But Madison Timber was a Ponzi scheme, and "[i]n [the Fifth] circuit, proving that [a transferor] operated as a Ponzi scheme establishes the fraudulent intent behind the transfers it made." *S.E.C v. Res. Dev. Int'l, LLC*, 487 F.3d 295, 301 (5th Cir. 2007); *see also Quilling v. Schonsky*, 247 Fed. App'x 583, 586 (5th Cir. 2007) ("[T]ransfers made from a Ponzi scheme are presumptively made with intent to defraud, because a Ponzi scheme is, as a matter of law, insolvent from inception.").

Moreover, in a Ponzi scheme case, a "transferee['s] knowing participation is irrelevant" to whether a transfer was fraudulent. *Janvey v. Alguire*, 647 F.3d 585, 598 (5th Cir. 2011). A receiver's proof of the existence of a Ponzi scheme "obviat[es] the need to prove fraudulent intent of the *transferees*," in this case, Cowgill. *Id.* at 599 (emphasis in original). A receiver need only show "that each individual received transfers of money from the Ponzi scheme" to establish that the transfers were fraudulent. *Id.*

The complaint alleges that Cowgill "received 1% of each dollar of each investment made by an investor recruited by Stewart, and 2% of each dollar of each investment made by an investor recruited by him" from Madison Timber.[116] Because Madison Timber was a Ponzi scheme, it follows that Madison Timber's transfers of money to Cowgill were "presumptively made with the intent to defraud." *Quilling*, 247 Fed. App'x at 586.

Further, as a matter of law, a recruiter like Cowgill who induces new investors to invest in a Ponzi scheme does not provide reasonably equivalent value in exchange for his commission payments. "It takes cheek to contend that in exchange for the payments he received, the [Madison Timber] Ponzi scheme benefitted from his efforts to extend the fraud by securing new investments." *Warfield v. Byron*, 436 F.3d 551, 560 (5th Cir. 2006). Cowgill, like the recruiter-investor in *Warfield*, extended the Madison Timber fraud by recruiting new investors to the scheme.[117] Cowgill did not provide reasonably equivalent value for the payments he received. The complaint states a fraudulent transfer claim against Cowgill.

## VII. Mutual of Omaha Insurance Company and Mutual of Omaha Investor Services, Inc. are alter egos.

"The Mississippi Supreme Court defines alter ego as '[a] corporation used by an individual in conducting personal business, the result being that a court may impose liability on the individual by piercing the corporate veil when fraud has been perpetrated on someone dealing with the corporation.'" *Jordan v. Maxfield & Oberton Holdings LLC*, 173 F. Supp. 3d 355, 360 (S.D. Miss. 2016) (quoting *Tanfield Eng'g Sys., Inc. v. Thornton*, 97 So. 3d 694, 702 (Miss. 2012) (some

---

[116] Doc. 1 at ¶ 54.

[117] *See, e.g.*, Doc. 1 at ¶¶ 54–55.

internal quotation marks omitted)).[118] "The presence of an alter ego relationship is a question of fact." *Flores v. Bodden*, 488 Fed. App'x 770, 775 (5th Cir. 2012). This issue is therefore inappropriate for resolution on a motion to dismiss. *See Smith v. Regional Transit Authority*, 756 F.3d 340, 347 (5th Cir. 2014) ("[D]isputed questions of fact are anathema to Rule 12(b)(6) jurisprudence . . . .").

The allegations in the complaint, taken as true, are sufficient to allege that Mutual of Omaha Insurance Company ("MOIC") and Mutual of Omaha Investment Services, Inc. ("MOIS") are alter egos.

MOIC argues that the complaint does not allege any of the "ten non-exclusive factors" Mississippi courts look to "[i]n determining whether piercing the corporate veil is permitted."[119] MOIC relies on *Buchanan v. Ameristar Casino Vicksburg, Inc.*, 957 So. 2d 969 (Miss. 2007), but the Mississippi Supreme Court in *Buchanan* expressly stated that "this Court **has not adopted** the [ten] factors as applied by the federal courts." *Id.* at 977 (emphasis added). Instead, the factors considered by Mississippi courts are: "(a) some frustration of contractual expectations regarding the party to whom [the plaintiff] looked for performance; (b) the flagrant disregard of corporate formalities by the defendant corporation and its principals; (c) a demonstration of fraud or other equivalent misfeasance on the part of the corporate shareholder." *Id.* (quoting *Gray v. Edgewater*

---

[118] Alter ego liability applies to equally to related corporate entities. "(A)ccording to a number of cases, the notion of separate corporate existence of parent and subsidiary or affiliated corporations will not be recognized where one corporation is so organized and controlled and its business conducted in such a manner as to make it merely an agency, instrumentality, adjunct, or alter ego of another corporation." *Beco, Inc. v. Am. Fid. Fire Ins. Co.*, 370 So. 2d 1343, 1346 (Miss. 1979) (quoting 18 Am. Jr. 2d Corporations § 17, at 565–66 (1965) (emphasis added)) .

[119] Doc. 49 at 4.

*Landing, Inc.*, 541 So. 2d 1044, 1047 (Miss. 1989)). The complaint sufficiently alleges facts, described herein, that if true would satisfy each prong of the piercing the corporate veil test.[120]

The complaint explains that MOIC "authorized or directed" the acts of MOIS and its agents; it is therefore reasonable to infer that Adams and Madison Timber looked to MOIC for performance.[121] *See Foamex, L.P. v. Superior Prods. Sales, Inc.*, 361 F. Supp. 2d 576, 577 (N.D. Miss 2005) (noting proof of the "frustration of performance" prong was presented when a corporate shareholder "undertook to personally pay" debts incurred by the corporation). The complaint also alleges that MOIC and MOIS "effectively operate as a single business enterprise"; it is therefore reasonable to infer that MOIC and MOIS disregarded corporate formalities.[122]

Finally, the complaint alleges more than sufficient facts, described herein, that if true demonstrate fraud on the part of MOIC, MOIS, and MOIS's agents Patridge and Murphree. It is this prong that is most significant to Mississippi courts. *See Kramer v. Keys*, 643 F.2d 382, 385 (5th Cir. Apr. 1981) ("Mississippi recognizes the principle that its courts will ignore separate corporate entities in order to defeat a fraud, wrong or injustice, at least where as here, the rights of third persons are concerned.") (internal citation omitted).

---

[120] *But see Phillips v. MSM, Inc.,* No. 3:12-cv-175, 2015 WL 420327 (S.D. Miss. Feb. 2, 2015): "Mississippi law . . . allows for exceptions to the three-part standard [for veil-piercing] where rigidly maintaining the corporate entity would subvert the ends of justice." *Id.* at *9. In *Phillips*, although there was no evidence the defendants had disregarded corporate formalities, they had transferred assets from one corporation to another, which "served to avoid liability" for a judgment. *See id.* Those transfers created a question of fact as to whether defendants had "subverted justice." *Id.*

[121] Doc. 1 at ¶ 141.

[122] Doc. 1 at ¶ 141. The "corporate formalities" prong is generally proved or disproved not at the motion to dismiss stage but after document discovery has revealed whether corporate formalities were in fact observed. *See, e.g., Rest. of Hattiesburg, LLC v. Hotel & Rest. Supply, Inc.*, 84 So. 3d 32, 42 (Miss. Ct. App. 2012) (analyzing whether documents that were produced evidenced separate accounting and thus created a fact issue on this prong*); Gecko Prods. Corp. v. Casablanca Constr. Inc.*, 250 So. 3d 508, 513–14 (Miss. Ct. App. 2018) (finding "credible evidence to support this prong" in light of defendant's failure to produce any documents showing maintenance of corporate formalities).

Moreover, as this Court explained in *Jordan*, the alter ego doctrine, while "often discussed in conjunction with piercing the corporate veil," has "a different application and analysis." 173 F. Supp. 3d at 360 (quoting Jackson & Miller, 3 Encyclopedia of Mississippi Law § 22:37 (2001) (noting the two phrases are "generally used without great specificity of meaning")). Alter ego liability "has an unmistakable air of equity." *Id.* at 361 (quoting Jackson & Miller, 3 Encyclopedia of Mississippi Law § 22:38 (2001)). This Court observed in *Jordan* that failing to apply the alter ego doctrine in that case "could sanction a fraud." *Id.* The same risk applies here. It risks sanctioning a fraud indeed to use the legal fiction of corporate separateness to relieve from liability a sophisticated financial services company that is alleged to have been "in an advantageous position to discover that Madison Timber was a fraud," but instead turned a blind eye to its agents' substantial assistance in recruiting new investors to Madison Timber's fraudulent scheme.[123]

## VIII. The Receiver's claims are not for deepening insolvency, and she has standing to sue for the harm Defendants caused to the Receivership Estate.

BankPlus and Mutual of Omaha contend that, even if the complaint adequately states claims (which it does), the complaint should nonetheless be dismissed because its claimed damages are for "deepening insolvency."[124] BankPlus admits that "deepening insolvency" is "unacknowledged" in the Receiver's complaint. That is because she does not allege deepening insolvency, either as an independent cause of action or as a measure of damages.

"Deepening insolvency has been defined as prolonging an insolvent corporation's life through bad debt, causing the dissipation of corporate assets." *In re SI Restructuring, Inc.*, 532 F.3d 355, 363 (5th Cir. 2008). Put another way, a deepening insolvency claim is one made on behalf of a once-legitimate and viable corporation for "the fraudulent prolongation of its life past

---

[123] *See* Doc. 1 at ¶¶ 79–81.
[124] Doc. 31 at 34–36; Doc. 49 at 15–16.

solvency." *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340, 351 (3d Cir. 2001). [125] Madison Timber was an insolvent, illegal enterprise from its inception. The Receiver does not allege that Defendants caused a legitimate business to become insolvent or less solvent; she does not allege "diminution in value," as BankPlus suggests. [126] She alleges that Defendants' commission of multiple independent torts was "essential to the growth" of a Ponzi scheme and that but for Defendants' "encouragement and assistance," Madison Timber "would have failed before ensnaring hundreds of new investors." [127] Defendants' tortious actions contributed to Madison Timber's success over time, and therefore to the Receivership Estate's liabilities today.

It is well established in the Fifth Circuit that equity receivers have standing to assert tort claims based on "the harm to the Receivership Estate's ability to repay its creditors"—that is, to sue for damages in the form of increased and unnecessary liability to third parties. *See, e.g.*, *Rotstain v. Trustmark National Bank*, No. 3:09-cv-2384, 2015 WL 13034513, *9 (N.D. Tex. Apr. 21, 2015) ("[T]he Receiver has standing to assert tort claims based on the harm to the Receivership Estate's ability to repay its creditors."); *Janvey v. Willis of Colorado Inc.*, No. 3:13-cv-3980, 2014 WL 12670763, at *4 (N.D. Tex. Dec. 5, 2014), amended for other reasons sub nom. *Official Stanford Inv'rs Comm. v. Willis of Colorado, Inc.*, No. 3:13-cv-3980, 2015 WL 13742125 (N.D. Tex. Feb. 4, 2015) (allegations that "Defendants knowingly contributed to the growth and success

---

[125] In each of the cases on which BankPlus relies a once-solvent entity suffered a loss in value. *See In re SI Restructuring, Inc.*, 532 F.3d 355, 362 (5th Cir. 2008) (plaintiff argued that "the value of the company deteriorated as a result of [a] loan transaction, thus decreasing the amount of funds available for the creditors"); *In re VarTec Telecom, Inc.*, 335 B.R. 631, 645 (Bankr. N.D. Tex. 2005) (defendant loaned money to an entity, allegedly allowing entity "to go deeper into the zone of insolvency, to become more insolvent, or to exist past the point of insolvency"); *In re Hallwood Energy, L.P.*, No. 10-03263, slip op. at 20 (Bankr. N.D. Tex. Nov. 18, 2013) (a bankrupt entity argued its "value was substantially diminished" as a result of its attorney's breaches). Madison Timber never had any value; the Receiver's claims are for Defendants' contribution to its increased and unnecessary legal and financial liability to third parties.

[126] Doc. 31 at 35–36.

[127] Doc. 1 at ¶¶ 91, 100, 110, 125, 134.

of the scheme, thereby increasing the Receivership Estate's liability to its creditors" are, "[f]or the purposes of standing, . . . enough to state an injury to the Receivership Estate . . . ."); *Official Stanford Inv'rs Comm. v. Greenberg Traurig, LLP*, No. 3:12-cv-4641, 2014 WL 12572881, at \*6 (N.D. Tex. Dec. 17, 2014) ("This Court has held that the Receiver may assert tort claims against third parties based on allegations that the third parties' torts contributed to the liabilities of the Receivership Estate."); *Janvey v. Adams & Reese*, LLP, No. 3:12-cv-0495, 2013 WL 12320921, at \*4 (N.D. Tex. Sept. 11, 2013) ("[B]ecause the Lawyer Defendants and the Director Defendants did not stop Stanford from controlling his entities to perpetuate his fraud and use Stanford Entities funds for his own lavish lifestyle, money was improperly diverted from the entities, causing injury to those entities. This harmed the Stanford Entities' ability to repay their creditor-investors."). The extent to which Defendants' actions harmed the Receivership Estate is not one of standing; it is a question of damages not to be decided on a motion to dismiss.

## IX.    The *in pari delicto* doctrine does not bar the Receiver's claims.

BankPlus, Gee Gee Patridge, Jason Cowgill, and Mutual of Omaha all argue the Receiver's claims against them are barred by the *in pari delicto* doctrine. The doctrine is an equitable, affirmative defense, which provides that "a wrongdoer is not entitled to compel contribution from a joint tortfeasor." *Sneed v. Ford Motor Co.*, 735 So. 2d 306, 308 (Miss. 1999). BankPlus contends the doctrine relieves it of liability for its "inaction" and "passivity"—"really negligence or silence"—simply because, according to BankPlus, Lamar Adams was the "active" wrongdoer.[128]

---

[128] Doc. 31 at 37. BankPlus cites *Long Term Care, Inc. v. Jesco, Inc.*, 560 So. 2d 717 (Miss. 1990), for the proposition that an "active wrongdoer" is more at fault than a "passive wrongdoer." Doc. 31 at 37. *Long Term Care* considered whether, under the doctrine of "common law indemnity," a tortfeasor who volunteered payment to the injured plaintiff in a premises liability case was entitled to indemnity from its fellow tortfeasor. The question here is not one of indemnity. And this is not a premises liability case. *Reed v. D & D Drilling & Expl., Inc.*, 27 So. 3d 414, 416 (Miss. Ct. App. 2009) (declining to consider an argument related to passive negligence because the case was not a premises liability case). In any event, BankPlus

Gee Gee Patridge and Mutual Omaha contend the doctrine is a defense to their tortious conduct because they are "innocent"[129] and "derived no benefit"[130] from Madison Timber. These arguments have no basis in law or equity.

BankPlus argues allowing the Receiver, who stands in the shoes of Adams and Madison Timber, to sue others, including BankPlus, "strains judicial notions of standing past their breaking points."[131] The Fifth Circuit disagrees. *See, e.g.*, *Rotstain*, 2015 WL 13034513, at *9 ("The Court has rejected [the argument that the Receiver has no standing to bring tort claims] in the past and held that the Receiver has standing to assert tort claims based on the harm to the Receivership Estate's ability to repay its creditors."); *Greenberg Traurig, LLP*, 2014 WL 12572881, at *4 ("This Court has held that the Receiver may assert tort claims against third parties based on allegations that the third parties' torts contributed to the liabilities of the Receivership Estate."); *Willis of Colorado, Inc.*, 2014 WL 12670763, at *3 (allowing the receiver to pursue "common law tort claims because they allege that Defendants' participation in a fraudulent marketing scheme increased the sale of Stanford's CDs, ultimately resulting in greater liability for the Receivership Estate"); *Adams & Reese, LLP*, 2013 WL 12320921, at *1 (allowing the receiver to pursue civil conspiracy claim is for conspiracy to commit fraud, breaches of fiduciary duty, fraudulent

---

was not a "passive wrongdoer." *See Borne v. Estate of Carraway*, 118 So. 3d 571, 588 (Miss. 2013) (quoting *Titus v. Williams*, 844 So. 2d 459, 466 (Miss. 2003) ("One is only passively negligent if he merely fails to act in fulfillment of duty of care which law imposes upon him, while one is actively negligent if he participates in some manner in conduct or omission which caused injury."); *J.B. Hunt Transp., Inc. v. Forrest Gen. Hosp.*, 34 So. 3d 1171, 1174 (Miss. 2010) (for a wrongdoer to be "passive," he must be "free of fault" and must not have "actively or affirmatively participate[d] in the wrong"). As expressly alleged in the complaint, BankPlus actively participated in growing the Madison Timber Ponzi scheme. For example, the complaint alleges that BankPlus, Gee Gee Patridge, Stewart Patridge, Jason Cowgill, and Martin Murphree formed an agreement with Wayne Kelly, a principal of Madison Timber, to recruit investors to the Ponzi scheme. Kelly paid them commissions for each investor they recruited. The complaint further alleges that BankPlus employees provided office space at BankPlus's Southaven branch and verified certain wires, commissions, and deposits of Madison Timber investors' checks.

[129] Doc. 49 at 7.

[130] Doc. 34 at 15.

[131] Doc. 31 at 37.

transfers, and conversion because the lawyer defendants "were in advantageous positions to discover Stanford's fraud and . . . they either failed to discover it or discovered it and chose not to act because they benefitted from the enterprise through their director fees or legal fees").

In federal equity receiverships, the Fifth Circuit has adopted the "innocent successor" exception to the *in pari delicto* doctrine. This exception allows a receiver to assert tort claims against professionals even though she has stepped into the wrongdoer's shoes. The rationale for applying the "innocent successor" exception in a federal equity receivership such as this is straightforward: A receiver has a duty to maximize the value of a receivership estate for the benefit of victims, and "[a]pplication of *in pari delicto* would undermine one of the primary purposes of the receivership." *Jones v. Wells Fargo Bank, N.A.*, 666 F.3d 955, 966 (5th Cir. 2012). Application of *in pari delicto* in a federal equity receivership would also "be inconsistent with the purposes of the [*in pari delicto*] doctrine," which is "not for the benefit of either party and not to punish either of them, but for the benefit of the public." *Id.* (quoting *Lewis v. Davis*, 145 Tex. 468, 199 S.W.2d 146, 151 (1947)); *see also Janvey v. Adams & Reese, LLP*, No. 3:12-cv-0495, 2013 WL 12320921, at *3 (N.D. Tex. Sept. 11, 2013) ("In other words, whether to apply *in pari delicto* typically depends on what best serves public policy.").

"It is [therefore] well established [in the Fifth Circuit] that when the receiver acts to protect innocent creditors . . . [s]he can maintain and defend actions done in fraud of creditors even though the corporation would not be permitted to do so." *Jones*, 666 F.3d at 966 (internal quotation marks and citation omitted). Indeed, the *Stanford* court has refused to apply the *in pari delicto* doctrine to that receiver's claims against professionals. *See, e.g.*, *Greenberg Traurig, LLP*, 2014 WL 12572881, at *4 ("This Court has already held that the *in pari delicto* defense has little application when a receiver seeks to reclaim assets for innocent investors."); *Willis of Colorado, Inc.*, 2014

WL 12670763, at *4 (same); *Adams & Reese, LLP*, 2013 WL 12320921, at *3 ("The Fifth Circuit, when applying Texas law, seems to hold the view that when a receiver is protecting innocent creditors or recovering assets for investors and creditors, the defense of *in pari delicto* should be rejected generally.").

Jason Cowgill contends that "Mississippi courts have not yet spoken on the question" and speculates that, if asked, they would find that the "innocent successor" exception does not apply here.[132] Cowgill, like Gee Gee Patridge and Mutual of Omaha, premises his argument on case law from the Seventh Circuit, New York, and South Carolina.[133] Neither Cowgill, Gee Gee Patridge, or Mutual of Omaha explain why they believe Mississippi courts would look to courts in the Seventh Circuit, New York, or South Carolina for guidance, when courts in the Fifth Circuit have addressed the issue repeatedly and convincingly. They do not explain why they believe Mississippi courts would reject the Fifth Circuit's rationale in virtually identical cases.

Indeed, Mississippi courts have long recognized "important limitations" to the *in pari delicto* doctrine. *Morrissey v. Bologna*, 123 So. 2d 537, 543 (Miss. 1960). "Even where the contracting parties are *in pari delicto*, the courts may interfere from motives of public policy. Whenever public policy is considered as advanced by allowing either party to sue for relief against the transaction, then relief is given to him." *Id.*; *see also Rideout v. Mars*, 54 So. 801, 802 (Miss. 1911) ("However, there is a well-defined exception to that rule, which is that, where the paramount public interest demands it, the court will intervene in favor of one as against the other.").

There is a "paramount public interest" in the Receiver's recovery. *Rideout*, 54 So. at 802. There is no public interest in, and the purpose of the *in pari delicto* doctrine is not served by,

---

[132] Jason Cowgill acknowledges the exception. *See* Doc. 41 at 11. Without using the label "innocent successor exception," Gee Gee Patridge and Mutual of Omaha make essentially the same arguments. *See* Doc. 34 at 14–16; Doc. 49 at 5–7.

[133] Doc. 34 at 14–15; Doc. 41 at 11–12; Doc. 49 at 5–7.

barring the Receiver from pursuing claims against defendants who are alleged to have aided and abetted a Ponzi scheme by their recklessness.[134] Excepting the Receiver from the *in pari delicto* doctrine is prudent and consistent with Fifth Circuit **and** Mississippi law.

Like the courts before it, this Court too should find "*in pari delicto* no impediment to the Receiver's standing to assert [her] tort claims." *Greenberg Traurig, LLP*, 2014 WL 12572881, at *4.

## CONCLUSION

Defendants have not stated a basis for dismissing any of the Receiver's claims against them. The Receiver asks to be permitted to proceed with discovery, in anticipation of presenting of her case to a jury.

---

[134] Doc. 1 at ¶¶ 86–88.

2abf79edc47f73f0

June 17, 2019

Respectfully submitted,

*/s/ Lilli Evans Bass*                                    */s/ Kristen D. Amond*

BROWN BASS & JETER, PLLC                    FISHMAN HAYGOOD, LLP
Lilli Evans Bass, Miss. Bar No. 102896        *Admitted pro hac vice*
LaToya T. Jeter, Miss. Bar No. 102213        Brent B. Barriere, *Primary Counsel*
1755 Lelia Drive, Suite 400                         Jason W. Burge
Jackson, Mississippi 39216                          Kristen D. Amond
Tel: 601-487-8448                                        Rebekka C. Veith
Fax: 601-510-9934                                       201 St. Charles Avenue, Suite 4600
bass@bbjlawyers.com                                  New Orleans, Louisiana 70170
*Receiver's counsel*                                     Tel: 504-586-5253
                                                                  Fax: 504-586-5250
                                                                  bbarriere@fishmanhaygood.com
                                                                  jburge@fishmanhaygood.com
                                                                  kamond@fishmanhaygood.com
                                                                  rveith@fishmanhaygood.com
                                                                  *Receiver's counsel*


## CERTIFICATE OF SERVICE

I certify that I electronically filed the foregoing with the Clerk of Court using the ECF system which sent notification of filing to all counsel of record.


Date:   June 17, 2019                        */s/ Kristen D. Amond*