UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

| | |
|---|---|
| ALYSSON MILLS, IN HER CAPACITY AS RECEIVER FOR ARTHUR LAMAR ADAMS AND MADISON TIMBER PROPERTIES, LLC,<br><br>    Plaintiff,<br><br>  v.<br><br>BANKPLUS; BANKPLUS WEALTH MANAGEMENT, LLC; GEE GEE PATRIDGE, VICE PRESIDENT AND CHIEF OPERATING OFFICER OF BANKPLUS; STEWART PATRIDGE; JASON COWGILL; MARTIN MURPHREE; MUTUAL OF OMAHA INSURANCE COMPANY; MUTUAL OF OMAHA INVESTOR SERVICES, INC.; FEDERAL INSURANCE COMPANY; and CONTINENTAL CASUALTY COMPANY,<br><br>    Defendants. | Case No. 3:19-cv-196<br><br>Arising out of Case No. 3:18-cv-252, *Securities and Exchange Commission v. Arthur Lamar Adams and Madison Timber Properties, LLC*<br><br>Hon. Carlton W. Reeves, District Judge |

## AMENDED COMPLAINT

### * * * TRIAL BY JURY DEMANDED * * *

Alysson Mills, in her capacity as the court-appointed receiver for Arthur Lamar Adams and

Madison Timber Properties, LLC (the "Receiver"), through undersigned counsel, files this

Amended Complaint against BankPlus; BankPlus Wealth Management, LLC; Gee Gee Patridge,

Vice President and Chief Operating Officer of BankPlus; Stewart Patridge; Jason Cowgill; Martin

Murphree; Mutual of Omaha Insurance Company; Mutual of Omaha Investor Services, Inc.;

Federal Insurance Company ("Chubb"); and Continental Casualty Company ("CNA") (collectively "Defendants"), stating as follows:

## INTRODUCTION

For more than ten years, Arthur Lamar Adams ("Adams"), through his companies Madison Timber Company, Inc. and Madison Timber Properties, LLC ("Madison Timber"), operated a Ponzi scheme that defrauded hundreds of investors. Investors believed that Madison Timber used investors' money to purchase timber from Mississippi landowners; that Madison Timber sold the timber to Mississippi lumber mills at a higher price; and that Madison Timber repaid investors their principal plus interest with the proceeds of those sales. Investors received timber deeds that purported to secure their investments—but the deeds were fake. There was no timber and no proceeds from sales of timber. The money used to repay existing investors came solely from new investors.

Madison Timber had to continuously grow to repay existing and new investors, and continuously grow it did. In 2011, Madison Timber took in approximately $10 million from investors. By 2018 that number had grown by a factor of 16. In the one-year period prior to April 19, 2018, the date Adams surrendered to federal authorities and confessed to the Ponzi scheme, Madison Timber took in approximately $164.5 million. As of April 19, 2018, Madison Timber had 501 outstanding promissory notes, reflecting debts to investors of more than $85 million.[1]

Defendants substantially assisted Madison Timber's growth. Defendants lent their influence, their professional services, and even their customers to Madison Timber, establishing for it a de facto DeSoto County headquarters within BankPlus's Southaven, Mississippi branch

---

[1] The evidence at Adams's sentencing established that of the $164.5 million that Madison Timber received in its last year of operation, it paid back approximately $79.5 million, leaving an $85 million difference. The outstanding principal and interest owed to investors is necessarily higher.

office. Because Defendants contributed to the success of the Madison Timber Ponzi scheme, they

are liable to the debts of the Receivership Estate to investors.

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this action and its parties, and venue is proper in

this Court, pursuant to the Securities Act of 1933, 15 U.S.C. § 77v(a); the Securities & Exchange

Act of 1934, 15 U.S.C. § 78aa; 28 U.S.C. § 1692; and 28 U.S.C. § 754.

2.      This action arises in connection with and is ancillary to the civil action already

pending in this Court styled *Securities & Exchange Commission v. Arthur Lamar Adams and*

*Madison Timber Properties, LLC*, No. 3:18-cv-252-CWR-FKB.  In that civil action, the Securities

& Exchange Commission ("S.E.C.") alleges that "[b]eginning in approximately 2004," Adams,

through Madison Timber, "committed securities fraud by operating a Ponzi scheme" in violation

of the Securities Act of 1933 and the Securities & Exchange Act of 1934.[2]

3.      The S.E.C. requested that the Court appoint a receiver for the estates of Adams and

Madison Timber.[3]  As the Court that appointed the Receiver, this Court has jurisdiction over any

claim brought by the Receiver in the execution of her duties. "[I]t is well-settled that when an

initial suit results in the appointment of the receiver, any suit that the receiver thereafter brings in

the appointment court in order to execute h[er] duties is ancillary to the main suit." *U.S. Small Bus.*

*Admin. v. Integrated Envtl. Sols., Inc.*, No. 05-cv-3041, 2006 WL 2336446, at *2 (S.D. Tex. Aug.

10, 2006) (citing *Haile v. Henderson Nat'l Bank*, 657 F.2d 816, 822 (6th Cir. 1981)).  *See also* 28

U.S.C. § 1692 ("In proceedings in a district court where a receiver is appointed for property, real,

personal, or mixed, situated in different districts, process may issue and be executed in any such

district as if the property lay wholly within one district . . . ").

---

[2] Doc. 3, Securities & Exchange Commission vs. Adams, et al., No. 3:18-cv-00252 (S.D. Miss).
[3] Docs. 11, 21, Securities & Exchange Commission vs. Adams, et al., No. 3:18-cv-00252 (S.D. Miss).

4.     Consistent with that precedent, Chief U.S. District Judge Daniel P. Jordan III has ordered that all "cases filed by the duly appointed Receiver . . . which . . . arise out of or relate to [*Securities & Exchange Commission v. Arthur Lamar Adams and Madison Timber Properties, LLC*, No. 3:18-cv-252-CWR-FKB] shall be directly assigned by the Clerk of Court to U.S. District Judge Carlton W. Reeves and U.S. Magistrate Judge F. Keith Ball."[4]  In compliance with Chief Judge Jordan's order, the Receiver shall separately file, contemporaneously with this complaint, a notice of relatedness.

## PARTIES

5.     Plaintiff Alysson Mills is the Court-appointed Receiver for the estates of Adams and Madison Timber.  The Court's order of appointment vests in her the power to, among other things:

> investigate and . . . bring such legal actions based on law or equity in any state, federal, or foreign court as the Receiver deems necessary or appropriate in discharging her duties as Receiver.[5]

The Receiver brings this civil action in her capacity as Receiver and pursuant to the powers vested in her by the Court's orders and applicable law.  The Receiver has standing to pursue, *inter alia*, claims against third parties whose actions contributed to the success of the Madison Timber Ponzi scheme, and therefore to the debts of the Receivership Estate.

6.     Defendant BankPlus (with BankPlus Wealth Management, LLC, "BankPlus") is a Mississippi corporation doing business in Mississippi.

---

[4] Doc. 45, Securities & Exchange Commission vs. Adams, et al., No. 3:18-cv-00252 (S.D. Miss).

[5] Doc. 33, Securities & Exchange Commission vs. Adams, et al., No. 3:18-cv-00252 (S.D. Miss). By order dated August 22, 2018, the Court eliminated the requirement that the Receiver obtain "prior approval of this Court upon ex parte request" before bringing any legal action.  Doc. 38, Securities & Exchange Commission vs. Adams, et al., No. 3:18-cv-00252 (S.D. Miss).

7.      Defendant BankPlus Wealth Management, LLC (with BankPlus, "BankPlus") is a Mississippi limited liability company doing business in Mississippi.

8.      Defendant Gee Gee Patridge is an adult resident of Madison, Mississippi.  She is a Vice President and the former Chief Financial Officer and current Chief Operating Officer of BankPlus.

9.      Defendant Stewart Patridge is an adult resident of Madison, Mississippi. He is a former registered investment advisor and registered broker affiliated with BankPlus Wealth Management, LLC who worked in BankPlus's DeSoto County branch offices. He was also affiliated with Mutual of Omaha.

10.     Defendant Jason Cowgill is an adult resident of Jonesboro, Arkansas. He is a former loan officer for BankPlus and was the branch manager of BankPlus's Southaven, Misssissippi branch office.

11.     Defendant Martin Murphree is an adult resident of Summit, Mississippi. He is a former registered investment advisor and registered broker affiliated with BankPlus Wealth Management, LLC who worked in BankPlus's DeSoto County branch offices. He was also affiliated with Mutual of Omaha.

12.     Defendant Mutual of Omaha Insurance Company (with Mutual of Omaha Investor Services, Inc., "Mutual of Omaha") is a Nebraska corporation registered to do business in Mississippi under the name "Mutual of Omaha Marketing Corporation."

13.     Defendant Mutual of Omaha Investor Services, Inc. (with Mutual of Omaha Insurance Company, "Mutual of Omaha") is a Nebraska corporation doing business in Mississippi and is Mutual of Omaha's registered broker-dealer.

14.     Defendant Federal Insurance Company, a part of the Chubb Group of Insurance Companies, is an Indiana corporation doing business in Mississippi and is BankPlus's primary liability insurer.

15.     Defendant Continental Casualty Company, a subsidiary of CNA Financial Corporation, is an Illinois corporation doing business in Mississippi and is BankPlus's excess liability insurer.

**MADISON TIMBER**

16.     For more than ten years, Lamar Adams, through Madison Timber, operated a Ponzi scheme that purported to purchase timber from Mississippi landowners and resell it to Mississippi lumber mills at higher prices.

17.     Investors in Madison Timber delivered to Madison Timber large sums of money, typically in excess of $100,000 dollars, in reliance on the promise that Madison Timber would repay them their principal plus interest of not less than 12% per annum, and sometimes as much as 20% per annum.  The promised interest invariably far exceeded the interest any investor might receive on any other collateralized investment.

18.     Investors believed that Madison Timber would use their money to acquire timber deeds and cutting agreements from Mississippi landowners; that Madison Timber would then sell the timber to Mississippi lumber mills at a higher price; and that with the proceeds of those sales Madison Timber would repay investors their principal and promised interest.

19.     In exchange for their investments, investors in the Madison Timber Ponzi scheme received a promissory note in the amount of their investment, payable in twelve monthly installments together with the promised interest; twelve pre-dated checks, each in the amount of the installment due under the promissory note; a timber deed and cutting agreement by which a

6

named landowner purported to grant to Madison Timber the rights to harvest timber on the land described in the deed; and a timber deed and cutting agreement by which Madison Timber purported to grant its own rights to the investor.

20.    In fact, the timber deeds and cutting agreements were fake.  Madison Timber had no rights to harvest timber and no timber to cut and sell.  Because Madison Timber had no revenues whatsoever, investors were being repaid with new investors' money.

21.    Each month, Madison Timber required more and more new investors to repay existing investors.  Like any Ponzi scheme, Madison Timber had to continuously grow.  To grow Madison Timber, Adams relied on recruiters, including Defendants, to attract new investors.

22.    In 2011, Madison Timber took in approximately $10 million from investors.  By 2018 that number had grown by a factor of 16.

23.    In April 19, 2018, on the heels of investigations of him by the F.B.I. and the U.S. Attorney's Office for the Southern District of Mississippi, Adams turned himself in. In the one-year period prior to April 19, 2018, Madison Timber took in approximately $164.5 million. As of April 19, 2018, Madison Timber had 501 outstanding promissory notes, reflecting debts to investors of more than $85 million.[6]

24.    Adams pleaded guilty to the federal crime of wire fraud and "admit[ted] to all of the conduct of the entire scheme and artifice to defraud."[7]  On October 30, 2018, he was sentenced to a term of imprisonment of 235 months.[8]

25.    The S.E.C. separately charged Adams with violations of the Securities Act of 1933 and Securities & Exchange Act of 1934, alleging in its complaint that "[b]eginning in

---

[6] The evidence at Adams's sentencing established that of the $164.5 million that Madison Timber received in its last year of operation, it paid back approximately $79.5 million, leaving an $85 million difference.  The outstanding principal and interest owed to investors is necessarily higher.

[7] Doc. 11, United States v. Adams, No. 3:18-cr-00088 (S.D. Miss).

[8] Doc. 21, United States v. Adams, No. 3:18-cr-00088 (S.D. Miss).

approximately 2004," Adams, through Madison Timber, "committed securities fraud by operating a Ponzi scheme."[9]

26.    The promissory notes sold by Madison Timber to investors were "securities," as that term is defined under 15 U.S.C.A. §78(c)(A)(10) and Miss. Code Ann. § 75-71-102(28).

27.    As alleged in the complaint in the underlying action *SEC v. Arthur Lamar Adams et al.*, No. 3:18-cv-252 (S.D. Miss.), and in the bill of information filed against Adams in *U.S. v. Arthur Lamar Adams*, No. 3:18-c-188 (S.D. Miss.), Adams, Madison Timber, and their affiliates, including Defendants, facilitated sales of promissory notes to investors through material misstatements and omissions; employed a device, scheme, or artifice to defraud; and engaged in acts, practices, or courses of business that operated or would operate as a fraud or deceit, all in violation of Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(A); Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, thereunder; as well as the Mississippi Securities Act, Miss. Code Ann. § 75-71-501.

28.    The sales furthermore violated the Securities Act of 1933 and the Mississippi Securities Act because there were no registration statements for the promissory notes, *see* Section 5 of the Securities Act of 1933, 15 U.S.C § 77e, and Miss. Code Ann. § 75-71-301; and the promissory notes were not exempt from registration, *see* Section 5 of the Securities Act of 1933, 15 U.S.C § 77e, and Miss. Code Ann. §§ 75-71-201 through 75-71-203.

## BANKPLUS

29.    Madison Timber's relationship with BankPlus began in January 2011 and continued until Madison Timber's collapse on April 19, 2018. Throughout this time period BankPlus employees substantially assisted Madison Timber's growth by recruiting new investors

---

[9] Doc. 3, Securities & Exchange Commission vs. Adams, et al., No. 3:18-cv-00252 (S.D. Miss).

to Madison Timber, including from BankPlus's own customers; lending their influence to Madison Timber, including by serving as a reference to potential investors; lending their resources, including BankPlus office space, for Madison Timber meetings; facilitating the financial transactions on which Madison Timber relied—payments to and from its investors and to and from its recruiters; and facilitating transfers, or "loans," from Wayne Kelly to Madison Timber that masked Madison Timber's insolvency.

**The introduction**

30.     In January 2011, Gee Gee Patridge was the Chief Financial Officer of BankPlus and worked in BankPlus's Jackson, Mississippi headquarters. Her son, Stewart Patridge, was a registered investment advisor and registered broker affiliated with BankPlus Wealth Management, LLC who worked in BankPlus's DeSoto County, Mississippi branch offices.

31.     Stewart was a childhood friend and college roommate of Wayne Kelly. As alleged in the complaint in the action *Mills v. Billings, et al.*, No. 3:18-cv-679 (S.D. Miss.), Kelly began working for Madison Timber as early as 2010. Madison Timber paid Kelly and his company, Kelly Management, a commission for each investment made by an investor that Kelly recruited. Kelly had check-signing authority for Madison Timber and was sometimes held out as its vice president. He engaged his own friends to "sub-recruit" for Madison Timber and paid them a percentage of his own commissions.

32.     Kelly introduced Gee Gee and Stewart to Adams and Madison Timber no later than January 2011. Gee Gee invested in Madison Timber for the first time shortly thereafter, in February 2011. She would continue to invest through 2014 and receive payments from Madison Timber until July 2015.

33.     Stewart saw in Madison Timber a money-making opportunity for himself. He set about identifying BankPlus customers who he might recruit to invest in Madison Timber. In exchange for his recruitment of new investors to Madison Timber, Kelly agreed to pay him 2% of each dollar of each investment made by an investor recruited by him.

34.     In late 2011, Stewart left BankPlus to become an agent for Mutual of Omaha.  He set up shop in the office of Martin Murphree, his friend and former business partner. Murphree previously worked with Stewart in BankPlus's DeSoto County branch offices as a registered investment advisor and registered broker affiliated with BankPlus Wealth Management, LLC. Stewart encouraged Murphree to identify individuals who he might recruit to invest in Madison Timber and agreed to pay Murphree out of his own commissions 1% of each dollar of each investment made by an investor recruited by Murphree.

**A Madison Timber headquarters in DeSoto County**

35.     Although Stewart and Murphree were agents of Mutual of Omaha, they relied on their affiliations with BankPlus, and BankPlus's resources, to recruit new investors to Madison Timber and to handle their investments. Indeed, BankPlus's Southaven, Mississippi branch office became a de facto DeSoto County headquarters for Madison Timber.

36.     Stewart and Murphree's friend, Jason Cowgill, was the manager of BankPlus's Southaven branch office. Stewart and Murphree used that office to conduct Madison Timber business with BankPlus customers. On information and belief, Kelly and Adams even held meetings with Madison Timber investors there. Cowgill was led to believe that BankPlus blessed the arrangement because Stewart's mother, Gee Gee, was the bank's Chief Financial Officer and was also an investor in Madison Timber.

37.     Kelly paid Stewart commissions from Kelly Management's bank account at BankPlus. As soon as he received confirmation that Madison Timber had received Stewart's and Murphree's investors' money, Kelly would call Cowgill and instruct him to pay Stewart cash from Kelly Management's bank account representing Stewart's commissions, from which Stewart would pay Murphree his share.

38.     Kelly would then send Stewart and Murphree their investors' promissory notes in the amounts of each investment, along with twelve pre-dated checks, each in the amount of the installment due under the promissory note. Murphree, and later Cowgill, was led to believe the accompanying paperwork had been "put together" by law firms including Butler Snow and Baker Donelson. Every month, Stewart and Murphree personally endorsed and deposited their investors' checks in their respective bank accounts, including at BankPlus. They retained their investors' promissory notes to return to Madison Timber after each investor's checks had been cashed. When one investment cycle ended, they called the investor to ask if they wanted to reinvest.

39.     This pattern continued into 2013, by which time Stewart and Murphree had recruited dozens of new investors, including BankPlus customers, to Madison Timber.

**A "referral" from BankPlus in Jackson**

40.     While her son recruited new investors, including from BankPlus's customers, Gee Gee Patridge, who in 2012 became BankPlus's Chief Operating Officer, helped Kelly recruit bigger investors in Jackson.

41.     As a regular investor in Madison Timber and as a friend, Gee Gee was in constant contact with Kelly. Even after she ceased investing in Madison Timber herself, she continued to facilitate the investments of another investor until Madison Timber's collapse on April 19, 2018. Kelly was a regular at BankPlus's Jackson headquarters, paying monthly and sometimes

semimonthly visits to drop off and pick up paperwork to and from Gee Gee. Kelly and Gee Gee were close enough that Kelly felt comfortable asking to borrow BankPlus's box at Ole Miss football games for Madison Timber business.

42.     In July 2013, Kelly told Gee Gee "I'm getting close to having the right kind of investors in place where we can do what we want." She told him she would be "glad" to serve as a "referral contact" for new potential investors. Vouching for Madison Timber, she told one potential investor that she "had approximately 300[,000] in now and had reinvested as several matured."

43.     Often Gee Gee already had a personal relationship with the potential investors who called her. Kelly sometimes asked her opinion of a potential investor's "investment capacity." In at least one instance she surmised "I would think pretty large." That particular investor was a client of Baker Donelson. Kelly told Gee Gee, "Lamar and I deal with Brent Alexander and Jon Seawright with Baker Donelson. They have a client that wanted some referrals concerning Madison Timber. You may get a call. I appreciate your allowing me to use your name." She responded "I know him well."

44.     Eventually Adams and Kelly prepared a document titled "Madison Timber Referral List" to give to potential investors. On information and belief, Brent Alexander and Jon Seawright of Baker Donelson shared the list with their own clients. The list identified five individuals, each affiliated with established firms or institutions in the Jackson area, who had agreed to serve as a "referral" for Madison Timber.  In addition to Gee Gee, who was identified as "Bank Plus Senior Executive Vice President & Chief Operating Officer," the list included Matt Thornton, "Butler Snow Advisory Services, LLC President & Chief Executive Officer"; Michael Billings, "Butler

Snow Advisory Services, LLC"; Jeff Rawlings, "Rawlings & MacInnis, P.A."; and Randy Shell, "Pinnacle Trust Senior Vice President & Trust Officer."

**A handoff with assistance from BankPlus**

45.     Meanwhile, in DeSoto County, Madison Timber's relationship with Stewart Patridge was growing strained.

46.     Sometimes Stewart represented that he had wired investors' money to Madison Timber when in fact he had not. Other times he confused investors' wires. As early as October 2012, Kelly warned him that "[w]e are not moving forward on any paperwork until all funds are received" and that Kelly himself would even come to his office "to straighten everything out." Stewart was unreliable but Madison Timber depended on the investment money he collected. Kelly told Adams on November 15, 2012, "[I]f ever wire comes in we will have a total of $324,000 from him this week!! The boy is rolling if everything comes in?? ha!!"

47.     Stewart sometimes failed to return investors' promissory notes to Madison Timber after all of their checks had been cashed. Kelly constantly had to hound him to return promissory notes for "mature tracts."

48.     Stewart also sometimes deposited investors' checks before they were due. In February 2013 Adams identified eight of Stewart's investors for whom he had already deposited checks dated March 1, 2013, March 15, 2013, and February 15, 2014. Kelly had to admonish him to "go through all checks and make sure they do not get deposited before the due date."

49.     Increasingly Kelly and Stewart relied on Cowgill, within BankPlus's Southaven branch office, to verify Stewart's wires and commissions and the deposits of his investors' checks. By May 2013, Cowgill himself was largely administering Stewart's Madison Timber business

with BankPlus customers. Kelly assured Adams that he had talked to "the manager of Bank Plus" and that he would be handling these investors' wires.

50.      In June 2013 Kelly discovered that some of Stewart's investors had tried to contact him about their Madison Timber investments and he had not returned their calls. Kelly advised Stewart that Adams personally would call one such investor "to reassure him that his investment is safe" and that he and Adams would send "a letter to each timber investor telling them we appreciate their joint venture etc and if they ever have any questions they are more than welcome to contact us." Incidentally, one disappointed investor was a client of Butler Snow. When that investor complained to Butler Snow that her note was "in arrears," Matt Thornton, President and Chief Executive Officer of Butler Snow Advisory Services, LLC, assured that "our dealings with Madison Timber have been nothing but 'first class'" and that he would "contact Lamar Adams (Principal) and Wayne Kelly (Partner)" to resolve things. Adams and Kelly informed everyone that "[t]he problem was with Stewart Patridge" and would not happen again.

51.      Over the next few months, Kelly worked to handoff the care of Stewart's investors to Cowgill and Murphree and reached out to Gee Gee Patridge for help. Gee Gee provided to Kelly contact information for Stewart's investors, and Kelly, Cowgill, and Murphree contacted the investors to advise that they would be overseeing their investments going forward. Gee Gee later contacted an answering service about answering Stewart's calls, proposing that it would advise "If you have a Madison Timber [question] please contact Wayne Kelly telephone # or I will be happy to have Wayne give you a return call."

52.      Initially Kelly paid Cowgill $500 a month to oversee Stewart's Madison Timber business from within BankPlus's Southaven branch office, which included filing out deposit slips for BankPlus customers and each month depositing their checks from Madison Timber in their

BankPlus bank accounts. BankPlus customers dropped off "new contracts" for Cowgill at BankPlus's Southaven branch office when they wanted to reinvest, and Cowgill directed BankPlus employees to wire money from the BankPlus customers' accounts to Madison Timber.

53.     During this time Kelly continued to pay Stewart commissions for these and other investors' investments. As before, Kelly called BankPlus's Southaven branch office to instruct its employees to withdraw cash, usually a few thousand dollars, from Kelly Management's bank account to give to Stewart—but by now Stewart rarely entered the bank to collect it. He simply picked it up at the bank's drive-thru window.

54.     Employees of BankPlus's Southaven branch office believed these otherwise unusual transactions were okay because Stewart's mother was BankPlus's Chief Operating Officer and an investor in Madison Timber.  It was also known that BankPlus made loans to BankPlus customers using their Madison Timber promissory notes as collateral. These facts legitimized Madison Timber and BankPlus employees' own handling of Madison Timber business.

55.     Eventually Kelly grew wary of paying Stewart any commissions at all. In July 2014 Kelly wrote Gee Gee that "I will make the check out to you or [Stewart's father] . . . You guys can give it to Stewart or whatever you want to do with it. I am not going to even try to deal with him." In August 2014 Kelly told Gee Gee that he would leave a check at her front desk, explaining that "The last time I tried to pay Stewart by check he claims he is not receiving his mail, and he wanted me to contact BPlus and have a cashier check made out to him (that's the way we did in the past) . . . but my accountant says I need to be writing checks. I would rather just give you his check and let you or [Stewart's father] cash it for him or whatever." In October 2014 Kelly wrote that "I closed a timber transaction with one of Stewart's people yesterday. I will bring a check for $3,000

and drop it off at your front desk today. Stewart does not know anything about this transaction. It's easier on me to just drop it off to you. I appreciate your handling this for me."

56.     Kelly finally decided to pay Stewart's commissions to Cowgill and Murphree instead. Cowgill received 1% of each dollar of each investment made by an investor recruited by Stewart, and 2% of each dollar of each investment made by an investor recruited by him. Murphree initially received 2%, later reduced to 1.75%, of each dollar of each investment made by an investor recruited by Stewart or by him. Both Cowgill and Murphree asked that their commissions checks be made to their wives.

57.     In February 2015 Cowgill left BankPlus for First Financial Bank in Senatobia, Mississippi, which in July 2015 he left for Community Mortgage Bank in Cordova, Tennessee, which in August 2015 he left for DeSoto Home Mortgage Bank in Southaven. On information and belief, Cowgill nevertheless continued to rely on the assistance of BankPlus employees to administer Madison Timber business, and they obliged. When he wanted BankPlus to wire money from a BankPlus customer's account to Madison Timber he simply called or emailed his former colleagues.

**Red flags**

58.     In 2013 and 2014, Stewart Patridge received payments of not less than $141,950 for his recruitment of new investors to Madison Timber. Between 2013 and April 19, 2018, Murphree (himself or through his wife) received payments of not less than $374,900, for his recruitment and handling of Madison Timber investments. Between 2014 and April 19, 2018, Cowgill (himself or through his then-wife) received payments of not less than $96,900, for his recruitment and handling of Madison Timber investments.

59.     Nevertheless, for all of the time that they sold Madison Timber investments, neither Stewart, Cowgill, nor Murphree—nor Gee Gee Patridge, on whose importance others relied—independently confirmed that the timber underlying Madison Timber investments was real.

60.     Not only did they fail to conduct any reasonable due diligence of their own, they recklessly ignored numerous red flags. Among other things, they knew or should have been aware of each of the following—any one of which is suspicious standing alone, but taken together clearly evidence a fraud:

    a.   The timber deeds and cutting agreements between landowners and Madison Timber were fake. The landowners' signatures, forged by Adams, often looked the same. *A call to any one of the hundreds of purported landowners, or a simple check of the title for any one of the hundreds of purported tracts of land, would have confirmed the truth.*

    b.   Madison Timber had no real contracts with any mills.  *A call to any one of the mills for which Madison Timber purported to have contracts would have confirmed the truth.*

    c.   Madison Timber required that an investor agree that he or she would not record the deed by which Madison Timber purported to grant its own rights to the investor unless and until Madison Timber failed to make a payment due under the promissory note. *These agreements were irregular and suspicious.*

    d.   The "profit" that Adams promised was 300% to 400% better than that payable by any other fully collateralized investment and was uniform and consistent. *These profits were irregular and suspicious.*

    e.   Madison Timber purported to have identified mills with an insatiable demand for timber at uniform prices. *The market price for timber is readily available from multiple sources, and any one of those sources would have confirmed that the market price for timber actually rises and falls, sometimes dramatically, over short periods of time.*

    f.   In 2014, Adams decided that he did not want to have to manage Madison Timber during the month of December. Madison Timber's recruiters were advised that

Madison Timber would not issue checks in December going forward; what had been a 12-month payoff would become a 13-month payoff, skipping the last month of the year. *This event was suspicious.*

g.  In October 2016, Madison Timber abruptly changed banks, and each recruiter was responsible for collecting within a short period of time all outstanding pre-dated checks from his individual investors and then reissuing new pre-dated checks drawn from Madison Timber's new account at a different bank. *This event was suspicious.*

**BankPlus's knowledge**

61.  Even more astounding than Stewart and Gee Gee Patridge's, Cowgill's, and Murphree's failures to conduct any reasonable due diligence as to Madison Timber's legitimacy is the fact that as early as 2009, and no later than 2015, others in BankPlus suspected, and eventually confirmed, that Madison Timber was a fraud.

62.  In March 2009, a BankPlus vice president emailed colleagues, including members of BankPlus's fraud department and BankPlus's president for Madison County, to advise that a BankPlus account in the name of "Madison Timber Company LLC" had triggered a "Kite Suspect report." She described the situation:

> [T]he customer had come in a few days ago . . . concerned about some checks he had "written to clients", and that a wire had not come in to cover them. . . . [A]fter some conversation Mr. Adams indicated that he was friends with [a BankPlus colleague] and he would also call him. I contacted [the BankPlus colleague] and he stated that he does know Mr. Adams and that Mr. Adams had called him about the checks. . . .

> After reviewing the transactions occurring on the account I became very concerned about what has been transpiring over the last month. Last night there was a deposit for $44,450 consisting of a check drawn on [an account at another bank], and 2 checks paid for $29,000 and $16,000 payable to "MTC" that appear to have been deposited at [the other bank]. The current balance in the account is $1,473.53 . . . I will say here that the signatures on the . . . checks being deposited are very similar to the signatures on the Madison Timber Company checks that are paying.

> Although we have received 2 wires in to the account . . . , the "check" deposits to "check" paying transactions have continued after both wires, and the daily balances have continued to diminish.

18

Please review the activity in this account . . . .

On information and belief, BankPlus "had a conversation" with Adams but did not require him to close Madison Timber's account, which was still open at the time of Madison Timber's collapse on April 19, 2018. Going forward, however, Adams directed all investors to wire money to Madison Timber's account at Trustmark instead.

63.     In January 2015, BankPlus's president for Belzoni received a complaint from a BankPlus customer and Madison Timber investor regarding Stewart Patridge's handling of his investments. He wrote one of the bank's directors to inquire if he had "any insight on what [Stewart's] doing or maybe a company Madison Timber Company (Wayne Kelly)." He offered that the "business with Stewart P . . . really sounds kind of spooky."

64.     In February 2015, BankPlus's president for Belzoni shared with the same bank director documents he had received from the investor. He noted that the investor "has called Wayne Kelly and thinks that there is nothing left there and can't find Stewart." "Not much information to go on," he added, "but doesn't look/sound good to me."

65.     Apparently unrelatedly, in March 2015, BankPlus's president for Madison County sent an email to more than a dozen BankPlus colleagues inquiring "Does anyone know anything about: Madison Timber[,] Terry Wayne Kelly[,] Kelly Management ???" Separately, on the same day, she emailed BankPlus's president for DeSoto County to explain the basis for her inquiry. She wrote:

> [A colleague] in our Canton Branch who is the officer on Madison Timber called me to say that she does not trust Lamar Adams AT ALL! She said that he is constantly sell "timber shares" to people and giving them posted dated checks. She thinks it's all like a pyramid scheme. . . . [Another colleague], manager at our Pear Orchard Branch, said Wayne Kelly calls him all the time, always in a big hurry, checking on balances, deposits, checks, etc.

She followed up a couple of hours later:

[Another colleague] also knows of Lamar Adams because he is from the Greenwood area too. [He] said that over the years in talking to Greenwood people that the Madison Timber deal is a scheme. [He] also recalls [another colleague] (in our Fraud area) contacting him a while back because it appeared that they were kiting, so they had a conversation with Wayne about it and he quit . . . ALSO, [he] said that at one time Wayne Kelly was good friends with Stewart Patridge, Gee Gee's son…………just sayin'.

66.     The emails prompted BankPlus's president for DeSoto County to ask BankPlus's Bank Secrecy Act Officer, a certified anti-money laundering specialist, to look into "Wayne Kelly, Kelly Management, Madison Timber, Jason Cowgill, Magic Man LLC, Martin Murphree, & Lamar Adams."

67.     The request of BankPlus's Bank Secrecy Act Officer was made on a Friday and by the following Wednesday he had concluded Madison Timber's activities "appear to be money laundering." A few days later he shared a summary of his findings with a colleague:

It is believed that [Jason Cowgill] facilitated the majority of check deposits and wires out [to Madison Timber] for each BankPlus customer we have identified from North Mississippi. All deposits are from the same businesses with wires being sent back to the same businesses within a few days of the deposits or, in some cases, the exact same day as the deposits. . . . The checks have BankPlus "for deposit only" stamp as the endorsements and some are handwritten and appear to be the same handwriting on all checks being deposited. Mr. Cowgill would make the deposits for all of the accounts at the same time, by giving a stack of deposit tickets and checks to the teller to process the deposits for each account. The checks deposited all note a different payment number for each investment with Madison Timber. The memo lines have numbers for 1-12. We believe this is to keep track of what number payment they are on for each investment. It appears each investment is paid back to the customer in a year.

All of the checks are being written by Madison Timber Company, Inc. and Madison Timber Properties, LLC from Trustmark National Bank with the majority of the checks coming from Madison Timber Properties, LLC. . . . The signer for all of the checks being written off Trustmark's Madison Timber accounts is Terry Wayne Kelly. Mr. Terry Wayne Kelly does have another business account with BankPlus styled Kelly Management, LLC. Kelly Management, LLC is no longer registered with the Secretary of State for the State of Mississippi. We have contacted the signer about this issue, which is said [to] have been a mistake. The business is showing dissolved . . . .

For the [identified accounts,] the total for the checks deposited from Trustmark is $7,783,225 and the total amount of wires back to Trustmark to Madison Timber is

$7,491,617. This type of activity makes this appear to be some type of money laundering scam or scheme, which was facilitated by Jason Cowgill or Terry Wayne Kelly . . . .

After further research in Kelly Management, we discovered that Mr. Cowgill's wife . . . is receiving "consulting fees" from Terry Wayne Kelly and Kelly Management, Inc. We also discovered that Martin Murphree's wife . . . is also receiving checks for "consulting fees" from Kelly Management.

All of Kelly Management LLC business is being funded by Trustmark's Madison Timber business accounts. . . .

The summary became the basis for a suspicious activity report that he submitted to federal authorities on April 8, 2015.

68.     Notwithstanding these findings, BankPlus did nothing to curb Madison Timber's reliance on BankPlus to facilitate the financial transactions on which Madison Timber relied—payments to and from its investors, including BankPlus customers; payments to and from its recruiters; and transfers, or "loans," from Kelly that masked Madison Timber's insolvency. Kelly's continued use of his BankPlus accounts for Madison Timber business surprised at least one BankPlus vice president who was aware of BankPlus's findings.  Responding to an email regarding Kelly's banking activities in July 2015, the vice president responded: "I thought you said these accounts moved." It appears that BankPlus only asked Kelly to update Kelly Management's registration with the Mississippi Secretary of State.

69.     Emails show that throughout 2015 and 2016, and possibly after, Jason Cowgill continued to request the assistance of his former BankPlus colleagues to wire money from BankPlus customers' accounts to Madison Timber, and they obliged.

70.     Emails show that Gee Gee Patridge also continued to assist Kelly with his Madison Timber business. When, in July 2015, Kelly wanted to wire $230,000 from his personal account to Madison Timber, she personally instructed BankPlus employees to complete the transaction, adding "I am also coming to town if I need to sign the request." On information and belief,

transfers such as this, which Kelly sometimes called "loans," masked Madison Timber's insolvency and ensured that Madison Timber could continue to pay and recruit investors.

71.     Emails show that when, in April and May 2016, Kelly requested help collecting Kelly Management banking statements "to show checking deposits slips and copies of the checks," Gee Gee compiled and sent them to him.

72.     Emails show that, although Gee Gee herself ceased investing in Madison Timber in 2015, she continued to facilitate the investments of another investor. Kelly continued to make regular visits to BankPlus's Jackson headquarters to drop off and pick up that investor's paperwork at least through December 2016, and possibly after. The investor was still an investor when Madison Timber collapsed on April 19, 2018.

73.     Emails show that when a BankPlus vice president for Madison County reported that Kelly's large checks to and from Madison Timber were "throwing up a red flag to me," another BankPlus employee observed, "That's ok. I think they are ok since they have been banking with us since 2007. He is just transferring a lot of money between his personal account and Madison Timber."

**BankPlus's silence**

74.     Meanwhile, the investors, including BankPlus customers, who the Patridges, Cowgill, and Murphree recruited to invest in Madison Timber continued to invest in Madison Timber because they did not know what BankPlus knew.

75.     Most of these investors were not wealthy and were unsophisticated as investors. An investor who spoke at Adams's sentencing is representative. That investor, a senior citizen, told the court that Stewart Patridge introduced her to Madison Timber in 2012 and "since he was working at the bank, [she] thought it was a good idea." She entrusted all of her money, which she

had received following the deaths of four children, to him. Since Madison Timber's collapse, she

has had to sell her house and move in with her daughter. Her statement:

> I was introduced to Madison Timber through Mr. Stewart Patrick [Patridge] in 2012. I had my money invested in annuities, and he told me that Madison Timber will pay me more interest than the bank would, than the annuities would. So since he was working at the bank, I thought it was a good idea, so I decided to go that way. And after Mr. Patrick left, Jason Cowgill took his place.

> . . . And I was dealing with Mr. Cowgill, Mr. Wayne Kelly, Mr. Lamar Adams, through Jason Cowgill. And the money that I had invested came from my four deceased kids. Yes, I lost four kids. I lost three in ten years, and I lost another one in '15. And the impact it had on my life is that I had to sell my house, move in with my daughter, because I could no longer afford to keep my house and pay my doctor bills. I have to pay 20 percent of my doctor bill and buy all of my medication because I don't have a secondary insurance company. So God forbid if anything should happen to my daughter, I don't know what will happen to me because her house isn't paid for, and Mr. Lamar done took all of my money. So what am I supposed to do?

> And the part that really hurts so bad, him and his family is prospering off of my four deceased kids and I don't think that's fair. And the money I get every month don't come to $600 a month. And like I said, I have to pay 20 percent of my doctor bills. I have quite a few health problems. I take quite a bit of medicine every day, and I have to buy all of my medication. And if I had known this was as scam, I never would have took my money out of my annuity because my annuity was paying me interest, plus I wasn't losing anything.

The court asked the investor what bank employed Stewart Patridge.  She answered: "BankPlus in

Southaven, Mississippi, and so was Mr. Cowgill when he took over."

76.    BankPlus knew as early as 2009, and no later than 2015, that Madison Timber was

a fraud—but said nothing to the dozens of unknowing investors, including BankPlus customers,

who it exposed to Madison Timber. BankPlus's silence allowed Madison Timber to continue to

grow.

## MUTUAL OF OMAHA

77.     Madison Timber's relationship with Mutual of Omaha began in January 2011 and continued until Madison Timber's collapse on April 19, 2018.

78.     Stewart Patridge was a registered investment advisor and registered broker affiliated with Mutual of Omaha Investor Services, Inc., from 2011 to 2013, and possibly an ordinary agent affiliated with Mutual of Omaha thereafter.

79.     Martin Murphree was a registered investment advisor and registered broker affiliated with Mutual of Omaha Investor Services, Inc., from 2010 to 2014, and possibly an ordinary agent affiliated with Mutual of Omaha thereafter.

80.     Patridge and Murphree, as agents of Mutual of Omaha, substantially assisted Madison Timber's growth by recruiting new investors to Madison Timber.

81.     Mutual of Omaha, which is a sophisticated financial services company, was in an advantageous position to discover that Madison Timber was a fraud. It also had a duty to supervise its agents to ensure that they were not selling investments in a Ponzi scheme.

82.     On information and belief, Mutual of Omaha did nothing to supervise its agents in their sales of Madison Timber investments—or if it did, it did nothing to investigate Madison Timber.

83.     Mutual of Omaha's agents' acts, and Mutual of Omaha's own omissions, allowed Madison Timber to continue to grow.

## CAUSES OF ACTION
## COUNT I
## FOR CIVIL CONSPIRACY
## AGAINST ALL DEFENDANTS

84.     The Receiver re-alleges each of the foregoing paragraphs as though stated fully herein.

85.     Mississippi law defines a civil conspiracy as a "combination of persons for the purpose of accomplishing an unlawful purpose or a lawful purpose unlawfully." *Shaw v. Burchfield*, 481 So. 2d 247, 255 (Miss. 1985).

86.     Defendants conspired with Adams and Kelly to commit the tortious acts alleged in this complaint.

87.     Defendants agreed to assist Adams and Kelly by recruiting new investors to Madison Timber.

88.     Madison Timber was a Ponzi scheme; therefore Defendants and Adams and Kelly's purpose was unlawful.

89.     In addition, Defendants acted unlawfully. The securities that Defendants sold were not exempt from registration but were unregistered, in violation of federal and state law.

90.     In furtherance of their unlawful purpose, among other overt acts, Defendants recruited new investors to Madison Timber; received commissions from Madison Timber; lent their influence to Madison Timber, including by serving as a reference for Madison Timber; lent their resources, including their offices, to Madison Timber meetings; and facilitated the financial transactions on which Madison Timber relied—payments to and from its investors; payments to and from its recruiters; and transfers, or "loans," from Kelly that masked Madison Timber's insolvency.

91.     In view of the numerous red flags described in this complaint, Defendants knew or should have known that Madison Timber was a Ponzi scheme. Indeed, Defendant BankPlus did know.

92.     Numerous red flags notwithstanding, over the course of several years Defendants lent their influence, their professional services, and even their customers to Madison Timber, establishing for it a de facto DeSoto County headquarters within BankPlus's Southaven, Mississippi branch office. Madison Timber grew from an approximately $10 million-a-year Ponzi scheme in 2011 to an approximately $164.5 million-a-year Ponzi scheme as of April 19, 2018.

93.     Defendants were essential to the growth of the Madison Timber Ponzi scheme. But for Defendants' encouragement and assistance, Madison Timber would not have continuously grown—it would have failed before ensnaring hundreds of new unwitting investors.

94.     Defendants contributed to Madison Timber's success over time, and therefore to the Receivership Estate's liabilities today. Defendants and Adams and Kelly's civil conspiracy is a proximate cause of the debts of the Receivership Estate.

95.     Defendants are jointly and severally liable for the debts of the Receivership Estate, which their and Adams and Kelly's civil conspiracy proximately caused.

96.     Because Defendants acted with reckless disregard of the wellbeing of others, and in specific instances described in this complaint committed actual fraud, punitive damages are appropriate.

## COUNT II
## FOR AIDING AND ABETTING
## AGAINST ALL DEFENDANTS

97.     The Receiver re-alleges each of the foregoing paragraphs as though stated fully herein.

98.     The Restatement (Second) of Torts § 876(b) (1979) provides that a defendant is liable if he "knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself."  Stated differently, a defendant is liable for aiding and abetting the wrongful conduct of another.

99.     Defendants aided and abetted Adams and Kelly in committing breaches of duties owed by them to Madison Timber and in other tortious conduct alleged in this complaint.

100.    In view of the numerous red flags described in this complaint, Defendants knew or should have known that Madison Timber was a Ponzi scheme. Indeed, Defendant BankPlus did know.

101.    Numerous red flags notwithstanding, Defendants gave substantial assistance and encouragement to Adams and Kelly.  Over the course of several years Defendants lent their influence, their professional services, and even their customers to Madison Timber, establishing for it a de facto DeSoto County headquarters within BankPlus's Southaven, Mississippi branch office. Madison Timber grew from an approximately $10 million-a-year Ponzi scheme in 2011 to an approximately $164.5 million-a-year Ponzi scheme as of April 19, 2018.

102.    Defendants were essential to the growth of the Madison Timber Ponzi scheme.  But for Defendants' substantial assistance and encouragement, Madison Timber would not have continuously grown—it would have failed before ensnaring hundreds of new unwitting investors.

103.    Defendants contributed to Madison Timber's success over time, and therefore to the Receivership Estate's liabilities today. Defendants' substantial assistance and encouragement is a proximate cause of the debts of the Receivership Estate.

104.    Defendants are jointly and severally liable for the debts of the Receivership Estate, which their substantial assistance and encouragement proximately caused.

105.    Because Defendants acted with reckless disregard of the wellbeing of others, and in specific instances described in this complaint committed actual fraud, punitive damages are appropriate.

## COUNT III
## FOR RECKLESSNESS, GROSS NEGLIGENCE, AND AT A MINIMUM NEGLIGENCE AGAINST ALL DEFENDANTS

106.    The Receiver re-alleges each of the foregoing paragraphs as though stated fully herein.

107.    "Negligence is a failure to do what the reasonable person would do under the same or similar circumstances." *Estate of St. Martin v. Hixson*, 145 So. 3d 1124, 1128 (Miss. 2014).

108.    While negligence is the failure to exercise due care, recklessness "is a failure or refusal to exercise any care." *Maldonado v. Kelly*, 768 So. 2d 906, 910 (Miss. 2000).

109.    Defendants were in advantageous positions to discover that Madison Timber was a fraud.  In view of the numerous red flags described in this complaint, a reasonable person in the same or similar circumstances would have discovered that Madison Timber was a fraud. Indeed, Defendant BankPlus did discover that Madison Timber was a fraud.

110.    Defendants not only failed to exercise due care, they failed or refused to exercise any care at all in their dealings with Madison Timber.

111.    Defendants' recklessness, or at a minimum negligence, allowed Madison Timber to continuously grow.  Madison Timber grew from an approximately $10 million-a-year Ponzi scheme in 2011 to an approximately $164.5 million-a-year Ponzi scheme as of April 19, 2018.

112.    But for Defendants' recklessness, or at a minimum negligence, Madison Timber would not have continuously grown—it would have failed before ensnaring hundreds of new unwitting investors.

113.    Defendants by their recklessness, or at a minimum negligence, contributed to Madison Timber's success over time, and therefore to the Receivership Estate's liabilities today. Defendants' recklessness, or at a minimum negligence, is a proximate cause of the debts of the Receivership Estate.

114.    Defendants are liable for the debts of the Receivership Estate, which their recklessness, or at a minimum negligence, proximately caused.

115.    Because Defendants acted with gross negligence evincing a reckless disregard of the wellbeing of others, punitive damages are appropriate.

## COUNT IV
## FOR VIOLATIONS OF MISSISSIPPI'S FRAUDULENT TRANSFER ACT
## AGAINST STEWART PATRIDGE, JASON COWGILL, AND MARTIN MURPHREE

116.    The Receiver re-alleges each of the foregoing paragraphs as though stated fully herein.

117.    The Receiver may avoid any transfer made in violation of the Mississippi Uniform Fraudulent Transfer Act (the "Act"), MISS. CODE ANN. §15-3-101, *et seq.*

118.    Pursuant to § 107 of the Act, the Receiver may recover from any party any funds that Madison Timber transferred with the actual intent to hinder, delay, or defraud any of its

creditors. Because Madison Timber was a Ponzi scheme, by definition all transfers by Madison Timber were made with the actual intent to hinder, delay, or defraud its creditors.

119.    The Receiver is entitled to avoid all "commissions," fees, and other such payments paid by Kelly or Madison Timber to Defendants Stewart Patridge, Jason Cowgill, and Martin Murphree, and to the entry of a judgment against Defendants Stewart Patridge, Jason Cowgill, and Martin Murphree for the amount of all such monies received by them.

120.    Alternatively, the Receiver is entitled to recover all monies Madison Timber paid to Defendants Stewart Patridge, Jason Cowgill, and Martin Murphree, all through Kelly Management, an extension of Madison Timber, because (i) Madison Timber was insolvent when it paid those commissions through Kelly Management because its net liabilities far exceeded the value of its (nonexistent) assets and (ii) Madison Timber received no value for the commissions paid to Defendants Stewart Patridge, Jason Cowgill, and Martin Murphree.

## COUNT V
## FOR VIOLATIONS OF MISSISSIPPI'S RACKETEER INFLUENCED AND CORRUPT ORGANIZATION ACT
### AGAINST BANK PLUS

121.    The Receiver re-alleges each of the foregoing paragraphs as though stated fully herein.

122.    Mississippi's RICO statute provides: "It shall be unlawful for any person to conduct, organize, supervise or manage, directly or indirectly, an organized theft or fraud enterprise." MISS. CODE ANN. § 97-43-3.1.

123.    Madison Timber was a "fraud enterprise" within the meaning of Mississippi's RICO statute because "fraud enterprise" includes one conducted by "mail or other means of communication," MISS. CODE ANN. § 97-43-3.1, and Adams was convicted of wire fraud.

124.    Mississippi's RICO statute further provides: "It is unlawful for any person employed by, *or associated with*, any enterprise to conduct or participate, directly or indirectly, in such enterprise through a pattern of racketeering activity. . . ."  MISS. CODE ANN. § 97-43-5 (emphasis added).  "'Racketeering activity' means to commit, to attempt to commit, to conspire to commit . . . any crime which is chargeable under [Mississippi's RICO statute]," MISS. CODE ANN. § 97-43-3, including wire fraud.

125.    Defendant BankPlus participated, directly or indirectly, in the Madison Timber "fraud enterprise."

126.    Its participation allowed the Madison Timber "fraud enterprise" to continuously grow.  Madison Timber grew from an approximately $10 million-a-year Ponzi scheme in 2011 to an approximately $164.5 million-a-year Ponzi scheme as of April 19, 2018.

127.    But for its participation, the Madison Timber "fraud enterprise" would not have continuously grown—it would have failed before ensnaring hundreds of new unwitting investors.

128.    By its participation, it contributed to Madison Timber's success over time, and therefore to the Receivership Estate's liabilities today. Its participation is a proximate cause of the debts of the Receivership Estate.

129.    Defendant BankPlus therefore is liable for "threefold the actual damages sustained" by the Receivership Estate, punitive damages, and attorneys' fees.

31

## COUNT VI

### FOR NEGLIGENT RETENTION AND SUPERVISION

#### AGAINST BANKPLUS AND BANKPLUS WEALTH MANAGEMENT, LLC; AND AGAINST MUTUAL OF OMAHA INSURANCE COMPANY AND MUTUAL OF OMAHA INVESTOR SERVICES, INC.

130. The Receiver re-alleges each of the foregoing paragraphs as though stated fully herein.

131. "[A]n employer will be liable for negligent hiring or retention of his employee when an employee injures a third party if the employer knew or should have known of the employee's incompetence or unfitness." *Backstrom v. Briar Hill Baptist Church, Inc*., 184 So. 3d 323, 327 (Miss. Ct. App. 2016).

132. Agents of Defendants BankPlus and BankPlus Wealth Management, LLC, and also of Defendants Mutual of Omaha Insurance Company and Mutual of Omaha Investor Services, Inc., agreed to assist Madison Timber by, among other things, lending their influence, their professional services, and even their customers to Madison Timber, eventually establishing for it a de facto DeSoto County headquarters within BankPlus's Southaven, Mississippi branch office.

133. In view of the numerous red flags described in this complaint, Defendants BankPlus and BankPlus Wealth Management, LLC, as well as Defendants Mutual of Omaha Insurance Company and Mutual of Omaha Investor Services, Inc., knew or should have known of its agents' incompetence or unfitness.

134. Defendants BankPlus and BankPlus Wealth Management, LLC, as well as Defendants Mutual of Omaha Insurance Company and Mutual of Omaha Investor Services, Inc., were reckless, or at a minimum negligent, in retaining their agents and failing to supervise their agents' dealings.

135.    Defendants BankPlus and BankPlus Wealth Management, LLC's, and Defendants Mutual of Omaha Insurance Company and Mutual of Omaha Investor Services, Inc.'s, recklessness, or at a minimum negligence, allowed Madison Timber to continuously grow. Madison Timber grew from an approximately $10 million Ponzi scheme in 2011 to an approximately $164.5 million Ponzi scheme on April 19, 2018.

136.    But for Defendants BankPlus and BankPlus Wealth Management, LLC's, and Defendants Mutual of Omaha Insurance Company and Mutual of Omaha Investor Services, Inc.'s, recklessness, or at a minimum negligence, Madison Timber would not have continuously grown—it would have failed before ensnaring hundreds of new unwitting investors.

137.    Defendants BankPlus and BankPlus Wealth Management, LLC, and Defendants Mutual of Omaha Insurance Company and Mutual of Omaha Investor Services, Inc., by their recklessness, or at a minimum negligence, contributed to Madison Timber's success over time, and therefore to the Receivership Estate's liabilities today. Their recklessness, or at a minimum negligence, is a proximate cause of the debts of the Receivership Estate.

138.    Defendants BankPlus and BankPlus Wealth Management, LLC, and Defendants Mutual of Omaha Insurance Company and Mutual of Omaha Investor Services, Inc., are liable for the debts of the Receivership Estate, which their recklessness, or at a minimum negligence, proximately caused.

139.    Because Defendants BankPlus and BankPlus Wealth Management, LLC, and Defendants Mutual of Omaha Insurance Company and Mutual of Omaha Investor Services, Inc., acted with gross negligence evincing a reckless disregard of the wellbeing of others, punitive damages are appropriate.

## LIABILITY OF BANKPLUS
## FOR BANKPLUS WEALTH MANAGEMENT, LLC

140.     Defendant BankPlus is liable for the acts of BankPlus Wealth Management, LLC, and therefore the acts of its agents, because Defendant BankPlus authorized or directed those acts; had knowledge of, or gave consent to, those acts; or acquiesced in those acts when it knew or should have known that it should have taken steps to prevent them.

141.     Defendant BankPlus is liable for the acts of BankPlus Wealth Management, LLC, because the two effectively operate as a single business enterprise and are alter egos.

142.     The Receiver is entitled to a declaratory judgment holding, *inter alia*, that Defendant BankPlus is liable for payment of all damages or other relief awarded in favor of the Receiver and against BankPlus Management, LLC.

## LIABILITY OF MUTUAL OF OMAHA INSURANCE COMPANY
## FOR MUTUAL OF OMAHA INVESTOR SERVICES, INC.

143.     Defendant Mutual of Omaha Insurance Company is liable for the acts of Mutual of Omaha Investor Services, Inc., and therefore the acts of its agents, because Defendant Mutual of Omaha Insurance Company authorized or directed those acts; had knowledge of, or gave consent to, those acts; or acquiesced in those acts when it knew or should have known that it should have taken steps to prevent them.

144.     Defendant Mutual of Omaha Insurance Company is liable for the acts of Mutual of Omaha Investor Services, Inc., because the two effectively operate as a single business enterprise and are alter egos.

145.     The Receiver is entitled to a declaratory judgment holding, *inter alia*, that Defendant Mutual of Omaha Insurance Company is liable for payment of all damages or other relief awarded in favor of the Receiver and against Mutual of Omaha Investor Services, Inc.

34

## BANKPLUS'S VICARIOUS LIABILITY

146.    The apparent backing of Defendant BankPlus enabled Gee Gee Patridge, Stewart Patridge, Jason Cowgill, and Martin Murphree to assist Madison Timber in its unlawful business. Defendant BankPlus is liable for the negligent and reckless acts of their agents, including but not limited to Gee Gee Patridge, Stewart Patridge, Jason Cowgill, and Martin Murphree.

147.    The Receiver is entitled to a declaratory judgment holding, *inter alia*, that Defendant BankPlus is liable for payment of all damages or other relief awarded in favor of the Receiver and against Gee Gee Patridge, Stewart Patridge, Jason Cowgill, and Martin Murphree.

## MUTUAL OF OMAHA'S VICARIOUS LIABILITY

148.    The apparent backing of Defendant Mutual of Omaha enabled Stewart Patridge and Martin Murphree to assist Madison Timber in its unlawful business. Defendant Mutual of Omaha is liable for the negligent and reckless acts of their agents, including but not limited to Stewart Patridge and Martin Murphree.

149.    The Receiver is entitled to a declaratory judgment holding, *inter alia*, that Defendant Mutual of Omaha is liable for payment of all damages or other relief awarded in favor of the Receiver and against Stewart Patridge and Martin Murphree.

## COUNT VII
## FOR DECLARATORY JUDGMENT
### AGAINST FEDERAL INSURANCE COMPANY AND
### CONTINENTAL CASUALTY COMPANY

150.    Mississippi law entitles the Receiver to a declaratory judgment and judicial determination that the subject Federal Insurance Company (Chubb) and Continental Casualty Company (CNA) policies cover the conduct alleged in this amended complaint against BankPlus, BankPlus Wealth Management, LLC, and their agents.

WHEREFORE, the Receiver respectfully requests that, after due proceedings, including a trial by jury, the Court enter judgments:

1.  awarding damages, including punitive damages, in her favor and against BankPlus; BankPlus Wealth Management, LLC; Gee Gee Patridge, Vice President and Chief Operating Officer of BankPlus; Stewart Patridge; Jason Cowgill; Martin Murphree; Mutual of Omaha Insurance Company; and Mutual of Omaha Investor Services, Inc., jointly and severally;

2.  awarding any and all attorney's fees, costs, and interest allowed by contract or law; and

3.  awarding any and all other relief as may be just and equitable.

The Receiver further requests that, after due proceedings, the Court enter a judgment declaring that the subject Federal Insurance Company (Chubb) and Continental Casualty Company (CNA) policies cover the conduct alleged in this amended complaint against BankPlus, BankPlus Wealth Management, LLC, and their agents.

---

January 4, 2021

Respectfully submitted,

*/s/ Lilli Evans Bass*

BROWN BASS & JETER, PLLC
Lilli Evans Bass, Miss. Bar No. 102896
1755 Lelia Drive, Suite 400
Jackson, Mississippi 39216
Tel: 601-487-8448
Fax: 601-510-9934
bass@bbjlawyers.com

*/s/ Kristen D. Amond*

FISHMAN HAYGOOD, LLP
*Admitted pro hac vice*
Brent B. Barriere, *Primary Counsel*
201 St. Charles Avenue, Suite 4600
New Orleans, Louisiana 70170
Tel: 504-586-5253
Fax: 504-586-5250
bbarriere@fishmanhaygood.com

MILLS & AMOND LLP
*Admitted pro hac vice*
Kristen D. Amond
650 Poydras Street, Suite 1525
New Orleans, Louisiana 70130
Tel: 504-383-0332
Fax: 504-733-7958
kamond@millsamond.com
*Receiver's counsel*