| | |
|---|---|
| ALYSSON MILLS, IN HER CAPACITY AS RECEIVER FOR ARTHUR LAMAR ADAMS AND MADISON TIMBER PROPERTIES, LLC,<br><br>   Plaintiff,<br><br>v.<br><br>BANKPLUS; BANKPLUS WEALTH MANAGEMENT, LLC; GEE GEE PATRIDGE, VICE PRESIDENT AND CHIEF OPERATING OFFICER OF BANKPLUS; STEWART PATRIDGE; JASON COWGILL; MARTIN MURPHREE; MUTUAL OF OMAHA INSURANCE COMPANY; and MUTUAL OF OMAHA INVESTOR SERVICES, INC.,<br><br>   Defendants. | Case No. 3:19-cv-196 CWR-FKB<br><br>Arising out of Case No. 3:18-cv-252, *Securities and Exchange Commission v. Arthur Lamar Adams and Madison Timber Properties, LLC*<br><br>Hon. Carlton W. Reeves, District Judge |

## BANKPLUS'S MOTION FOR JUDGMENT ON THE PLEADINGS, OR ALTERNATIVELY MOTION FOR PARTIAL SUMMARY JUDGMENT

BankPlus and BankPlus Wealth Management, LLC, respectfully move for judgment on the pleadings, or alternatively, for partial summary judgment, on BankPlus's affirmative defenses numbered 11, 13, 28, and 30. BankPlus asks the Court to hold that, as a matter of law, these defenses are legally viable and, therefore, if any investor lacked good faith, possessed knowledge of the fraud, or did not reasonably rely on the representations of Madison Timber, then the Receiver owes those investors no debts.[1] In support, BankPlus states as follows:

### Facts and Procedural History

In its July 22, 2021 Answer [Doc. 125] to the Receiver's Amended Complaint, BankPlus asserted the following affirmative defenses that Receivership damages are limited to principal

---

[1] BankPlus incorporates by reference into this Motion all applicable arguments made in its Opposition to the Receiver's Motion for Judgment on the Pleadings [Doc. 189].

#100416788v4                                                                                         1

debts owed to good-faith investors who reasonably relied on Madison Timber representations. Relatedly, BankPlus asserted a defense that the Receiver has failed to mitigate Estate damages by not pursuing clawback actions against bad-faith investors or those invested without relying on Madison Timber representations:

- Eleventh Defense:  The Receiver's claims against BankPlus are barred, in whole or in part, because the Receiver failed to mitigate the alleged damages because she has not pursued fraudulent transfer claims against investors in MTP who (1) received payments from MTP in excess of principal invested, or (2) invested in MTP either in bad faith or without actual and reasonable or justifiable reliance. Those claims, subject to statutes of repose, have expired.

- Thirteenth Defense:  The Receiver's damages are limited to the amount of good-faith and reasonably or justifiably reliant investors' unpaid principal investments, net of false-profit payments.

- Twenty-Eighth Defense:  The Receiver cannot recover damages in excess of what the Receivership estate owes to the MTP Ponzi scheme victims, and those damages are limited to (1) unpaid principal, net of interest received, and (2) investors who acted in good faith, and with actual and reasonable or justifiable reliance in connection with their purchase of MTP promissory notes.

- Thirtieth Defense:  The Receiver's claims against BankPlus are barred, in whole or in part, by the absence of actual, justifiable, or reasonable reliance on the part of the MTP investors in connection with their purchase(s) of MTP promissory notes.

On February 23, 2022, the Receiver moved for Judgment on the Pleadings, or Alternatively Motion for Partial Summary Judgment [Docs. 183, 184]. The Receiver asked for a ruling from the Court on BankPlus's Thirtieth Defense,[2] arguing that investor reliance and the related concept of good faith are not elements of any of the claims the Receiver selected to bring against the defendants, and that "the Receiver's damages are the Receivership Estate's, not

---

[2] She lists Defenses 11, 13, and 28 in Footnote One of Doc. 184, but does not specifically ask the Court to address them. BankPlus opposed the Receiver's Motion on March 23 [Doc. 189] ("Opp."). The Receiver filed a Reply in support of her original motion on March 30 [Doc. 190] ("Reply").

#100416788v4                                               2

individual investors'…". [Doc 183 at 3]. BankPlus Defenses 11, 13, 28, and 30, however, assert Receivership damages do **not** include the claims of bad-faith investors or those who invested without relying on Madison Timber representations.

**Receivership Damages: Only Good-Faith Investors Possess Claims against the Receivership**

BankPlus's defenses find support in Fifth Circuit precedent, which limits the debts of a receivership to exclude claims by bad-faith investors. For instance, no individual investing with knowledge of the scheme's unlawful purpose has valid claims against the receivership; in fact, a receivership has claims against these bad-faith investors for any interest *and principal* payments they received from the scheme, because their knowing participation perpetuated the fraud. *See Janvey v. GMAG, L.L.C.*, 977 F.3d 422, 427 (5th Cir. 2020) (permitting receiver to clawback principal investments where transferee did not show "its conduct was honest in fact, reasonable in light of known facts, and free from willful ignorance of fraud"); *Janvey v. Brown*, 767 F.3d 430, 440-1 (5th Cir. 2014) (applying provisions of Texas' Uniform Fraudulent Transfer Act also present in Mississippi's version, and agreeing with district court that "only claim that [investors] have for their interest payments is a contractual one, which [] is unenforceable…. [T]here is no valid claim for interest; the CDs issued by [Stanford] are void and unenforceable.").

Because discovery remains in its early stages, BankPlus cannot know the extent to which the investors possessed or lacked good faith, or for that matter, whether the Receiver even inquired into investors' good faith.  But across her cases, the Receiver ascribes knowledge of Madison Timber's fraudulent purpose to defendants based on "red flags"—*available to all*

#100416788v4                                3

*investors*—that, "taken together clearly evidence a fraud."[3]  Those red flags included unreasonably high returns, here over 20% per annum real yield.[4]

If the Receiver's complaints sufficiently allege defendants' knowledge of fraud, then the Receivership has no debts to sophisticated investors with access to those same red flags. Knowledge of the scheme's unlawful purpose bars recovery for bad-faith investors and subjects them to clawback of both their fictitious profits and their invested principal. For these reasons, the task of separating good- and bad-faith investors requires discovery into their relative sophistication and the circumstances of their investments.

Indeed, early discovery suggests Madison Timber attracted "extremely sophisticated investors," many of whom enjoyed "access to fairly sophisticated analytical teams."  Exhibit 1 (to be submitted under seal), Billings Dep., 93.25-94.1, 108.13.[5]  The Court will see this in Exhibit 2 and Exhibit 3 (also to be submitted under seal), a list of Madison Timber investors:

- Investor 101 holds a Series 65 securities license and is the managing partner of a wealth management firm.
- Investor 24 is the general manager of an NBA franchise. Billings Dep., 62.1.
- Investor 115 "is a Harvard MBA, and former CFO of a publicly-traded company and is running a two billion dollar family office, [and] chose to personally invest his money in these timber tract transactions," even conducting his own due diligence. Billings Dep., 133.4-7.
- According to Mr. Billings, one investor is a former U.S. Ambassador who also founded "several public companies." Billings Dep., 69.22.

---

[3] *E.g.,* Case 3:19-cv-00196-CWR-LRA, Doc. 71 at 17-18. BankPlus disputes and does not concede that (1) red flags evidence actual knowledge, and (2) the Receiver may base her claims on some sort of constructive knowledge.  *See* BankPlus's Motion to Dismiss and Reply in support, Case 3:19-cv-00196-CWR-LRA, Docs. 77 (at 10-12) and 109 (at 12-14).

[4] *Id*., at 17.  MTP initially sold notes at a 12% discount to face value, later 13% (and sometimes at even greater discounts).  Because they amortized principal by paying initially in 12 equal monthly installments over one year, later over 13 months, but skipped December, the real interest rate was much higher. Exhibit 4, an email produced by the Receiver where Madison Timber promoter Michael Billings similarly characterized the real interest rate.

[5] BankPlus will file a motion under seal with the Court seeking an order allowing BankPlus to sumbit Exhibits "1," "2," "3," and "4" under seal, which contain investors' personal identifiable information.

- Investor 179's family wealth reaches to the "Fortune 400." Billings Dep., 82.13.
- Investors 64, 91, AS.08, AS.09, AS.12, AS.13, AS.19, AS.21, AS.22, AS.23, AS.26, and AS.32 are successful attorneys.[6]

Attorneys understand the purpose of land records and recording statutes perhaps better than any other type of investor—but despite this knowledge, Lamar Adams instructed each of them *not* to record their deeds of trust. None of the early discovery productions suggest that any of them in fact recorded their deeds. Did Adams's instruction to these attorneys alert them to Madison Timber's fraudulent purpose? Did they rely on Adams's statements making their investment decisions, or disregard them? Only discovery can answer these questions.

To be clear, BankPlus is not asking for summary judgment on these debts *yet*; rather, BankPlus asks the Court to hold that, as a matter of law, if any investor lacked good faith, possessed knowledge of the fraud, or did not reasonably rely on the representations of Madison Timber, then the Receiver owes those investors no debts.

### Bad-faith Investors Suffer No Underlying Tort or "Wrong" from Madison Timber and Have No Claims for Damages

The Receiver is correct that an underlying "wrong"—not necessarily a tort—must exist for a claim of civil conspiracy or aiding and abetting to succeed,[7] but she fails to grasp the application of the concept here. Reply at 2-4. When bad-faith investors join a Ponzi scheme, no

---

[6] Michael Billings recalled in his S.E.C. testimony that "we were swimming in a sea of lawyers from Day One." Billings Dep., 126.20-21. BankPlus will file a motion under seal with the Court seeking an order allowing BankPlus to sumbit Exhibits "1," "2," "3," and "4" under seal, which contain investor personal identifiable information.

[7] See *Sharkey v. Barber*, 188 So. 3d 1245, 1247 (Miss. Ct. App. 2016) (citing *Aiken v. Rimkus Consulting Grp. Inc.*, 333 F. App'x 806, 812 (5th Cir. 2009) (per curiam)) (Under Mississippi law, "the claim of civil conspiracy does not stand alone, but is dependent on conspiring to commit a particular wrong…."). Here, the Receiver has pleaded that the underlying wrong is Adams's fraud (Reply at 5)—a tort. *Rex Distrib. Co. v. Anheuser-Busch, LLC*, 271 So. 3d 445 (Miss. 2019) (The court did not dismiss the civil conspiracy claim because it found an underlying wrong – violation of a statute.); *State ex rel. Fitch v. Yazaki N. Am., Inc.*, 294 So. 3d 1178, 1184 (Miss. 2020) (The complaint failed to state a claim for civil conspiracy on which relief could be granted since there was no alleged underlying wrong.).

underlying wrong occurs against them at all. The bad-faith investors do not become "victims" of the scheme, but rather its accomplices.

Consider the following hypothetical: a potential Madison Timber investor approaches Lamar Adams after hearing about Madison Timber through his friends at the Jackson Country Club. Adams pitches the Madison Timber investment opportunity to him, and the investor tells Adams he will conduct additional diligence before making a decision. The investor, a sophisticated businessman, strongly suspects Adams's statements are too good to be true, and the investor's research of public land records supports his suspicions that Madison Timber is a fraud. Nonetheless, seeing his friends profit at more than 20 percent interest per year, the investor ignores Adams and his research and invests with Madison Timber anyway, planning to exit the scheme quickly before its collapse.

In this example, no tort or underlying wrong occurs because the investor enters the scheme in bad faith and does not rely on Adams' statements when making his investment decision—in fact, he disregards both them and his own research. As BankPlus asserted in its Thirtieth Defense, if an investor does not invest with "actual, justifiable, or reasonable reliance" on Madison Timber representations to him, he cannot claim that Madison Timber defrauded him. Further, the bad-faith investor does not injure Madison Timber by creating a debt Madison Timber owes to him, he only injures its good-faith investors by perpetuating the life of the scheme. In other words, the Receivership Estate owes him nothing; instead, he owes the Estate not only any interest in excess of invested principal he received, but also the entire amount of any repayments of his invested principal. He is not a liability on the books of the Receivership Estate, but an asset.

In this way investor good-faith and reliance form essential elements for the disposition of this case—not because they are elements of any of the torts the Receiver selected to bring in her cases, but because they are necessary considerations to determine whether an investor in fact suffered a "wrong" at the hands of Adams and Madison Timber.

The example of Madison Timber recruiters illustrates this problem well: in her accounting of money owed to investors, the Receiver names at least three Madison Timber recruiters who have faced either civil or criminal liability (or both) for their involvement in the scheme. See Investor Nos. 6, 93, and 184 in Exhibit 2. In other words, at the same time these individuals face potential liability for participating in a conspiracy to defraud investors, the Receiver calculates Estate damages based upon restitution to those exact same alleged fraudsters. That the Receiver has chosen not to make distributions to these individuals misses the point: if they acted in bad faith or did not rely on Madison Timber representations, their claims do not form part of the damages owed by the Receivership Estate, and their principal investments remain available for clawback.

### Ponzi Presumption Applies in Fraudulent-Transfer Context, Not Here

The Receiver attempts to import the Ponzi Presumption in support of her tort claims against BankPlus and other third-party defendants, arguing that the presumption establishes the underlying "wrongs" necessary for her civil conspiracy and aiding and abetting claims to succeed. See Receiver's Reply at 5 ("Plainly the Ponzi scheme itself is the wrong underlying the Receiver's entire case, including her aiding and abetting and civil conspiracy claims."). The Ponzi Presumption, however, does not apply in this fashion, but instead forms part of the foundation of actual fraudulent-transfer statutes that most Ponzi scheme receivers deploy to recover against bad-faith investors and similar transfers during the life of the scheme. *See*

*Generally The Ponzi Book,* Chapter 2 ("Actual Fraudulent Transfer Claims"), Subchapter 2.03(1)(a) ("The Ponzi Presumption") (Exhibit 5).

The Fifth Circuit has explained that "In this circuit, proving that [a transferor] operated as a Ponzi scheme establishes the **fraudulent** intent behind the transfers it made." *Rotstain v. Trustmark Nat'l Bank*, 2015 U.S. Dist. LEXIS 197469, at *28 (N.D. Tex. Apr. 21, 2015) (*quoting Janvey v. Alguire*, 647 F.3d 585, 598 (5th Cir. 2011) (*quoting SEC v. Res. Dev. Int'l, LLC*, 487 F.3d 295, 301 (5th Cir. 2007))) (emphasis added). Under this widely accepted Presumption, a Ponzi schemer's fraudulent intent for each of his transfers is presumed by operation of law after the existence of the scheme is established, here by Adams's guilty plea. *Id*. This permits receivers to clawback false winnings (or bad-faith investors' principal) with ease and dispatch through fraudulent-transfer statutes.

This misapplication of the Ponzi Presumption may relate to the Receiver's mistaken belief that she can enforce the terms of the Madison Timber promissory notes.[8] The law, however, holds that the contracts between a Ponzi scheme and its investors are void and unenforceable. *Janvey v. Brown*, 767 F.3d 430, 440-1 (5th Cir. 2014); *Janvey v. Alguire*, 2013 U.S. Dist. LEXIS 82568, at *65-66 (N.D. Tex. Jan. 22, 2013) ("Holding that a Ponzi scheme investor may recover payments made up to his principal investment is consistent with the vast majority of courts addressing the issue.") (affirmed by *Janvey v. Brown*) (briefed at length in BankPlus's Objection and Comment to First Proposed Distribution, at 2-5, Case No. 3:18-cv-252-CWR-FKB [Doc. 275]) (incorporated here by reference).

Because the inherently fraudulent nature of a Ponzi scheme negates any written contractual relief for investors, the law instead applies the general principles of value and

---

[8] See Reply at p. 7 (referencing investors "to whom Madison Timber contractually owes money…")

consideration to payments made by the scheme. The lynchpin of this framework is whether the Ponzi scheme issued its payments in exchange for "reasonably equivalent value" (consideration) from the transferee.[9] The law considers payments by a Ponzi scheme to good-faith investors as payments of legitimate debts owed by the scheme to the investor, up to the amount of principal invested and regardless of whether the scheme characterized the payments as interest. The "debt" is not contractual, but arises by operation of law: it is the fraud claim the good-faith investor possesses as a victim of the Ponzi scheme. In other words, when a good-faith investor invests in a Ponzi scheme, that investor has in fact purchased a cause of action for fraud against the scheme up to the amount of his invested principal. When the scheme issues a payment, it extinguishes the investor's cause of action for those funds, making the payment for principal valid under the law.[10]

---

[9] *See generally Scholes v. Lehmann*, 56 F.3d 750, 756-8 (7th Cir. 1995) (Posner, J.) ("principles of *Scholes* and its progeny" applied by *Janvey v. Democratic Senatorial Campaign Comm., Inc*., 712 F.3d 185, 192 (5th Cir. 2013)).

[10] *Janvey v. Brown*, 767 F.3d at 443. ("[P]rincipal payments made to the investor-defendants are not subject to [fraudulent transfer] claims. Unlike interest payments, it is undisputed that the principal payments were payments of an antecedent debt, namely fraud claims that the investor-defendants have as victims of the Stanford Ponzi scheme."); *Picard v. Gettinger (In re Bernard L. Madoff Inv. Sec. LLC),* 976 F.3d 184 (2d Cir. 2020) (considering Securities Investor Protection Act and Bankruptcy Code's fraudulent-transfer corollaries and affirming summary judgment that denied investors' claims to profits); *Perkins v. Haines*, 661 F.3d 623, 627 (11th Cir. 2011) ("In the case of Ponzi schemes, the general rule is that a defrauded investor gives 'value' to the Debtor in exchange for a return of the principal amount of the investment, but not as to any payments in excess of principal."); *Donell v. Kowell*, 533 F.3d 762, 777-78 (9th Cir. 2008) ("Up to the amount that 'profit' payments return the innocent investor's initial outlay, these payments are settlements against the defrauded investor's restitution claim. Up to this amount, therefore, there is an exchange of 'reasonably equivalent value' for the defrauded investor's outlay. Amounts above this, however, are merely used to keep the fraud going by giving the false impression that the scheme is a profitable, legitimate business. These amounts are not a 'reasonably equivalent' exchange for the defrauded investor's initial outlay."). *See also Warfield v. Carnie*, 2007 U.S. Dist. LEXIS 27610, at *36 (N.D. Tex. Apr. 13, 2007) ("As the Receiver correctly notes, a Ponzi scheme investor who receives an amount in excess of his or her initial investment has received two types of payments—(1) a full return of the principal investment and (2) amounts received in excess of the initial investment, i.e., 'fictitious profits.' The vast majority of courts that have considered the issue have held that a debtor does not receive reasonably equivalent value for any payments made to investors that represent false profits.").

For interest in a Ponzi scheme, on the other hand, the underlying debt is inherently void and unenforceable, whether the investor invested in good or bad faith.[11] This makes good sense from a policy perspective: where an entire business is bogus, how can the law enforce the terms of its investment contracts?[12] In this case, no timber grew for investors, just as no land owners signed their harvesting rights over to Adams, no saw mills executed cutting agreements with him, and no collateral protected investors' money from his greed. Nothing legitimate animated Adams's scheme. Madison Timber was merely a tangle of fraudulent transfers piled atop fraudulent transfers. Simply put, Ponzi scheme contracts are as empty as the profits they promise.

The Ponzi Presumption and fraudulent-transfer framework step into this void to arm receivers with extraordinary abilities to institute clawback actions over the life of the entire scheme. *See generally Scholes v. Lehmann*, 56 F.3d 750, 756-8 (7th Cir. 1995) (Posner, J.) ("principles of Scholes and its progeny" applied by *Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185, 192 (5th Cir. 2013)). Receivers and their counsel deploy this framework to increase recovery for innocent investors left standing at a scheme's collapse. But here, despite admitting the completely fraudulent nature of Adams's scheme, the Receiver seeks to enforce the usurious terms of Madison Timber's promissory notes still outstanding at collapse,

---

[11] *See Official Stanford Inv'rs Comm. v. Am. Lebanese Syrian Associated Charities*, 2015 U.S. Dist. LEXIS 199408, at *29 (N.D. Tex. July 22, 2015) ("contracts with a Ponzi scheme are void and unenforceable"); *Janvey v. Alguire*, 2013 U.S. Dist. LEXIS 82568, at *65-66 (N.D. Tex. Jan. 22, 2013) (*affirmed by Janvey v. Brown*); *Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*, 476 B.R. 715, 725 (S.D.N.Y. 2012) "[E]very circuit court to address this issue has concluded that an investor's profits from a Ponzi scheme, whether paper profits or actual transfers, are not for value."); *In re Bayou Group, LLC*, 362 B.R. 624, 635 (Bankr. S.D.N.Y. 2007) (collecting cases) (cited with approval by *Janvey v. Alguire*). Internal citations, punctuations, and quotations omitted.

[12] Poor policy results follow if the law enforces the terms of Ponzi scheme contracts and ignores whether individuals invested in good or bad faith: doing so rewards bad-faith investors who supported the scheme or ignored its fraudulent nature.

ignoring (and potentially forfeiting) the Estate's claims against investors who exited before collapse.

Furthermore, BankPlus agrees with the Receiver that the Order appointing her provides her discretion whether or not to pursue specific clawback actions. The law does not obligate her to pursue every possible clawback, nor should it: a clawback against an innocent investor who received meager amounts of false interest makes for poor use of a receiver's time. In this case, however, the Madison Timber scheme enriched dozens and potentially scores of sophisticated professionals who exited before the scheme's collapse or who received tens, even hundreds of thousands of dollars of false interest in excess of the principal they invested in the scheme. BankPlus's Eleventh Defense cites the lack of clawbacks as a failure by the Receiver to mitigate Estate damages. These types of targets normally constitute low-hanging fruit for receivers, but here the Receiver has left them to rot on the vine.

The law cabins the Ponzi Presumption's application to fraudulent-transfer statutes. It does not function to replace the requirement of a tort or "wrong" for the Receiver's claims against BankPlus and its defendants. The Court should therefore recognize that lack of investor reliance or good faith, or relatedly an investor's knowledge of the Madison Timber fraud, all constitute valid defenses, or if not specifically defenses, valid areas of inquiry for investor discovery to determine the true scope of Receivership debts.

### Counsel for Receiver Distorts Caselaw, BankPlus's Positions

Counsel for the Receiver regularly distorts BankPlus's attempts to sort innocent and guilty investors by stating BankPlus seeks to blame investors.[13] The distortion culminates in the

---

[13] "Now, BankPlus responds, as it typically does, by blaming the investors; that they knew just as much." June 11, 2021 Hearing Transcript at 23.8-9. Exhibit 6. "It takes cheek for a sophisticated financial institution such as BankPlus, who from its advantageous position saw all the indicia of fraud, to insist that it had no actual or constructive knowledge of the Ponzi scheme—but victims surely did," "What BankPlus really

#100416788v4                               11

Receiver's Objection to the proposed investor subpoenas on p. 14, which describes BankPlus's efforts as "outrageous posturing." A side-by-side presentation of the Receiver's edited quotation of undersigned counsel's remarks before this Court, and the original, unedited remarks, reveals alteration that significantly alters the words' meaning:

| **Receiver's Edits to Quotation** | **Actual Quotation without Alteration** |
|---|---|
| "BankPlus says investors 'got into the Ponzi scheme knowing that it was one.'"[14] | "It is conceivable -- and this is one reason why we'd like to depose many of the investors, perhaps all, but it is conceivable that some investors got into the Ponzi scheme knowing that it was one -- I can't really imagine anybody doing that reasonably, but it's conceivable -- or, as the Ponzi scheme went on, came to realize that it was a Ponzi scheme and stayed in."[15] |

Distortions also appear in the Receiver's analysis of case law in her Reply supporting her Motion for Judgment on the Pleadings, Doc. 190. The Receiver's misrepresentations of *Rex, Aiken,* and *Sec. & Exch. Comm'n v. Am. Pension Servs.*, *Inc.* are just three examples of her distortions.[16]

First, to the extent the Receiver represents that *Rex* and *Aiken* stand for the notion that she does not have to prove an underlying wrong, the Receiver is incorrect. The Receiver stated in her Reply that "Mississippi law does not require the Receiver to prove the specific tort of

---

wants is to tell the Receiver how to do her job. If it were up to BankPlus, the Receiver would prosecute the Ponzi scheme's victims instead of its banks," and "The reasons BankPlus and other defendants want to subpoena and depose every victim of Madison Timber are all improper, but chief among them is delay." Reply at 10, 12.

[14] Doc. 184 at 9.

[15] Exhibit 7, December 7, 2021 Hearing Transcript at 64.2-8.

[16] *Rex Distrib. Co. v. Anheuser-Busch, LLC*, 271 So. 3d 445 (Miss. 2019); *Aiken v. Rimkus Consulting Grp. Inc.,* 333 F. App'x 806 (5th Cir. 2009); and *Sec. & Exch. Comm'n*, 2015 U.S. Dist. LEXIS 188898 (D. Utah Feb. 27, 2015).

securities fraud . . . . It is enough that BankPlus aided and abetted Lamar Adams and Wayne Kelly's unlawful course of action" and cites to *Rex* to support that idea. [Doc. 190, p. 3]. However, the *Rex* court upheld the civil conspiracy claim because there was, in fact, a specific, identifiable, and proven "underlying wrong." *Rex* at 455. Namely, the proven "underlying wrong" was a violation of a Mississippi statute, which was "a claim upon which relief can be granted." *Id.* The *Rex* court neither stated nor implied that a party would not have to prove an underlying wrong for a civil conspiracy claim. Additionally, *Rex* is distinguishable from the instant matter since the Receiver fails to identify or provide a basis for an underlying wrong upon which relief could be granted.

Second, the Receiver stated that the "plaintiff [in *Aiken*] apparently did not prove the alleged underlying conduct was unlawful" to imply that a plaintiff does not need to prove the underlying unlawful conduct for a civil conspiracy claim. [Doc. 190, p. 4]. That is not true. On page 4 of Doc. 190, the Receiver pulled a quote from *Aiken* that says, "They do not explain how such failures, assuming they occurred, were 'unlawful.'" *Aiken,* 333 F. App'x at 812. However, the Receiver's Reply ignored that the *Aiken* court held that the failure to demonstrate and prove the unlawfulness caused the civil conspiracy claim to fail. *Id.*

Next, the Receiver cut off a quote that misrepresents the actual meaning in her citation to *Sec. & Exch. Comm'n v. Am. Pension Servs., Inc*. Specifically, the Receiver's trimmed quote from the case states, "Requiring the Receiver to trace the losses and pursue clawback actions is inconsistent with the court-directed goals of the Receiver . . . ." [Doc. 190, p. 11]. However, for complete case-specific context, the quote continues, ". . . to expeditiously allow APS clients to move their accounts to a successor custodian administrator ("Successor") free from the constraints of the receivership." *Sec. & Exch. Comm'n*, 2015 U.S. Dist. LEXIS 188898, at *6.

The court determined that tracing losses and pursuing clawbacks was inconsistent with that specific court's directed goals since it would cost millions of dollars, take approximately nine months to pursue clawbacks against former clients with an uncertain and possibly unlikely potential of recovery, and "significantly extend the receivership and delay account transfers and the winding up of the affairs of the business, which would cause great harm to [its] clients . . . ." *Id.* at *5-*6. The Receiver's choice to cherry-pick from the full quote misrepresents that pursuing losses and clawbacks are inconsistent with all court-directed goals in all cases, rather than accurately representing the court-specific goals of *Sec. & Exch. Comm'n v. Am. Pension Servs., Inc.*

### Receiver Repeatedly Places Relative Investor Sophistication and Wealth at Issue

Even if the Court were to deny this Motion, the Court should nonetheless find that the individual investors' knowledge, good faith, and reliance are relevant and discoverable because the Receiver has placed them at issue on multiple occasions. The Receiver pleaded in her Amended Complaint that "Most of these investors were not wealthy and were unsophisticated as investors." [Doc. 71 at 22]. At the hearing on BankPlus's Motion to Dismiss, counsel for the Receiver alleged that defendants "in most parts, dealt with fairly unsophisticated investors, many of whom were BankPlus customers." June 11, 2021 Hearing Transcript, at 23.18-20 (Exhibit 6). In this way the Receiver has opened the door for BankPlus and other defendants to test her assertions about investor wealth and sophistication.

### CONCLUSION

BankPlus's defenses numbered 11, 13, 28, and 30 are not about harassing the Madison Timber Ponzi Scheme investors. They seek to separate those investors whom Adams and Madison

Timber in fact defrauded from the investors who gave Adams their money either knowing Madison Timber's fraudulent nature, or ignoring signs they knew indicated fraud.

BankPlus therefore respectfully requests this Court grant this Motion for Judgment on the Pleadings and hold that BankPlus's defenses are legally viable, and that information on the investors' good faith, including the existence and reasonableness of the investors' reliance on any of Madison Timber's representations, is relevant to these defenses and to the Receiver's own allegations.

Respectfully submitted,

*/s/ Robert B. Bieck, Jr.*
Kaytie M. Pickett (MS Bar 103202)
Robert B. Bieck, Jr. *(pro hac vice) (attorney in charge)*
Alexander N. Breckinridge, V *(pro hac vice)*
Thomas E. Slattery *(pro hac vice)*
JONES WALKER LLP
190 E. Capitol St., Ste. 800
Jackson, Mississippi 39205
Telephone: (504) 582-8724
Facsimile: (504) 589-8724
tslattery@joneswalker.com
abreckinridge@joneswalker.com

**Attorneys for Defendants BankPlus & BankPlus Wealth Management LLC**

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing pleading has been served on all parties and/or their counsel of record, by e-mail, by ECF, facsimile, by-hand, and/or by United States mail.

New Orleans, Louisiana, this 20th day of May, 2021.

*/s/ Robert B. Bieck, Jr.*
Robert B. Bieck, Jr.
